# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| Thomas Rao, | |
| Plaintiff, | **MEMORANDUM OPINION AND ORDER** |
| v. | Case No. 19-cv-923 (MJD/BRT) |
| St. Jude Medical S.C., Inc. and Abbott Laboratories, | |
| Defendants. | |

Caroline Elizabeth Bressman, Laura Farley, Michele R. Fisher, and Kayla Marie Kienzle, Nichols Kaster PLLP, Counsel for Plaintiff.

Kelly G. Laudon, Jamila Marjani Hall, Emily M. Peterson, and Benjamin L. Ellison, Jones Day, Counsel for Defendants.

## I.    INTRODUCTION

This matter is before the Court on Defendants' Motion for Sanctions (Doc. 166), Plaintiff's Motion to Bifurcate Trial (Doc. 189), Defendants' Motion for Summary Judgment (Doc. 194), Defendants' Motion to Exclude Expert Testimony of David D. Jones (Doc. 205), and Plaintiff's Motion for Partial Summary Judgment (Doc. 214).  The Court heard oral argument on the motions on August 9, 2022.  (Doc. 280 (hearing transcript).)

## II.   BACKGROUND

### A.    The Parties and Plaintiff's Employment with Abbott

Defendant Abbott Laboratories ("Abbott") acquired Defendant St. Jude Medical S.C., Inc. ("SJM") on January 4, 2017.[1]  (Doc. 139 at 30 ¶ 7.)

Plaintiff Thomas Rao began working for St. Jude in 1999 as an independent sales representative and then became a fulltime employee in 2004.  (Doc. 197, Laudon Decl., Ex. 1 (Rao Dep.) at 20, 29.)  Rao was a sales representative for cardiac rhythm management ("CRM") products in St. Jude's, and later Abbott's, sales territory near Sarasota, Florida.  (Id. at 27-28, 37-38, 44.)  CRM products are devices that control the rhythms of the heart.  (Id. at 28.)  Rao's job included

---

[1] The Court refers to the Defendants collectively as "Defendants" or "Abbott."

cultivating customer relationships with cardiologists, including general cardiologists who refer patients for implants of CRM devices but do not perform surgeries ("referring physicians") and cardiologists who specialize in implanting CRM devices, including electrophysiologists ("implanting physicians").  (Doc. 240, Laudon Decl., Ex. 14 ¶¶ 10-11.)

When a referring physician's patient needs an implantable CRM device, such as a pacemaker, the referring physician refers the patient to an implanting physician.  (Id. ¶ 10.)  The referring physician may also specify which brand of CRM device the implanting physician should select.  (Id.)  If the referring physician does not specify the brand of the CRM device, the implanting physician chooses the brand.  (Id. ¶ 11.)

CRM sales representatives, like Rao, generate sales by developing relationships with referring and implanting physicians.  Sales representatives may even attend surgeries and assist implanting physicians with ensuring that devices are functioning properly and are programmed to the physicians' specifications.  (Id. ¶¶ 13, 21.)  Later, sales representatives will attend checkups with referring physicians to help ensure patients' CRM devices are functioning properly.  (Id. ¶ 14.)

Rao had close relationships with some of his physician customers.  For example, Rao has been close personal friends with implanting physician Dr. Anthony Pizzo for approximately 30 years.  (Doc. 217, Fisher Decl., Ex. 6 (Pizzo Dep.) at 35, 48-49, 81-82, 122, 127-29.)

Abbott's CRM sales team in Sarasota consisted of sales representatives including Rao, Brian Giuliano, and Bob Souder; technical service specialists; and independent contractors referred to as contingent workers or "per diems."  (Doc. 196 at 3.)  Contingent workers provided additional coverage for physician customers when sales representatives or technical service specialists were not available.  (Id.)

Around 2014, St. Jude promoted Giuliano to be Territory Manager over Rao's sales team.  (Doc. 197, Laudon Decl., Ex. 6 (Otero Dep.) at 13-14; Ex. 4 (Giuliano Dep.) at 45.)  Giuliano became responsible for managing the team's day-to-day operations, scheduling, and tracking the team's sales.  (Id.)  Directly above Giuliano was the Regional Sales Director, Tom Skelly.  (Id., Ex. 1 (Rao Dep.) at 68.)  Above Skelly was Area Vice President for Cardiac Rhythm Management and Atrial Fibrillation, Jose Otero.  (Id.; see also Doc. 197, Laudon Decl., Ex. 6 (Otero Dep.) at 11-13.)

4

**B.     Plaintiff's Employment Agreement**

In October 2016, Rao and St. Jude executed a three-year Employment

Agreement.  (Doc. 198, Hawks Decl., Ex. 34.)  The Employment Agreement is

governed by Minnesota law and includes a Minnesota forum selection clause.

(Id. ¶ 10(G)-(H).)

**1.     Termination Provision**

The Employment Agreement allowed Defendants to terminate Rao's

employment "for cause."  (Id. ¶ 5(A).)  "Cause" is defined to include "negligence

or willful misconduct with respect to . . . [Defendants'] customers or potential

customers" and "failure to perform Employee's duties as reasonably directed by

[Defendants] following notice of such failure and a reasonable opportunity for

Employee to remedy or cure any such failure."  (Id.)

**2.     Non-Compete Provision**

The Employment Agreement also includes a non-compete provision:

Non-Competition. During Employee's employment for a period of
one (1) year after the date of termination of employment with SJMSC
for any reason, Employee will not directly or indirectly sell,
demonstrate, promote, solicit or support the sale of, support or
supervise the implantation or other use of, or otherwise have any
involvement with the sale or use of any product which competes
with any products which Employee sold or solicited the sale of
during his/her employment, to or with any customer upon whom
Employee called during the last year of his/her employment.  For a

period of one (1) year after the date of termination of employment
with SJMSC for any reason, Employee will not directly or indirectly
influence or attempt to influence such customers to direct their
business involving products sold by Employee to any competitor of
SJMSC.

(Id. ¶ 8.)

### 3.    Confidentiality Provision

The Employment Agreement also includes a confidentiality provision:

Employee will not disclose to a third party or use for Employee's
personal benefit Confidential Information of SJMSC.  'Confidential
Information' means any information used or useful in SJMSC's
business that is not generally known outside of SJMSC and that is
proprietary to SJMSC relating to any aspect of SJMSC's existing or
reasonably foreseeable business which is disclosed to Employee or
conceived, discovered or developed by Employee.  Confidential
Information includes but is not limited to: product designs,
including drawings and sketches; manufacturing materials; sales
and marketing plans or proposals; customer information;
manufacturing processes; price, accounting and cost information;
clinical data; administrative techniques and documents; and
information designated by SJMSC as 'Confidential.'

(Id. ¶ 7(B).)

### C.    2018 Amended Partnership Agreement

Rao also participated in a commission-sharing partnership with Souder

and Giuliano under which the three equally split the commissions the team

earned.  (Doc. 198 ¶ 6; Doc. 202, Hawks Decl., Ex. 33.)  A February 2018

amendment to Rao's Employment Agreement documented this commission-

sharing partnership.  (<u>Id.</u>)  If a partner left his employment with Abbott, his share

of commissions would be divided equally among the remaining team members.

(<u>Id.</u>; Doc. 197, Ex. 1 (Rao Dep.) at 125.)

### D.    Plaintiff's Past Performance

Abbott's Sarasota sales team was a top performing team with a "pretty

solid track record of performance."  (Doc. 197, Ex. 6 (Otero Dep.) at 22.)  For 2017,

Rao's territory manager, Giuliano, rated him as "Fully Successful" and achieving

expectations, and in a review from 2016, Skelly commended Rao on being "a

tremendous asset to the territory for many years," "a great leader," and

complimented him for "a proven successful sales history." (Doc. 231, Fisher

Decl., Exs. 63-64.)  Rao's supervisors stated he "exceeds expectations" in multiple

annual reviews.  (Doc. 202, Hawks Decl., Exs. 35-37.)

Abbott, however, emphasizes several negative reviews Rao received over

the course of his 20-year career with Defendants.  (<u>See, e.g.</u>, <u>id.</u>, Exs. 37-38.)

Between 2012 and 2018, five physicians banned Rao from providing service or

support to their practices.  (Doc. 202, Laudon Decl., Ex. 26.)  Otero, however,

testified that it was not unusual for a physician to not want to work with a

particular sales representative.  (Doc. 197, Ex. 6 (Otero Dep.) at 82.)  There were

some doctors who preferred to work with Rao over others.  (<u>Id.</u> at 87–89.)

7

E.     **Plaintiff's Relationship with Dr. Daniel Friedman**

Electrophysiologist Dr. Daniel Friedman was an implanting physician at

Bradenton Cardiology near Sarasota, Florida.  (Doc. 197, Laudon Decl., Ex. 3

(Friedman Dep.) at 19-20.)  Dr. Friedman is Giuliano's friend and a paid

consultant with Giuliano's company, Aziyo Biologics.  (Id. at 18-19.)  Throughout

2018, Dr. Friedman also made several complaints about Rao to Abbott, which

ultimately led Abbott to terminate Rao's employment.

F.     **July 2018 Meeting Regarding Dr. Antonio Moretta**

In late June 2018, Dr. Friedman became upset when he found out that Rao

was setting up a dinner with an implanting physician whom Dr. Friedman was

trying to recruit to his practice, Dr. Antonio Moretta.  (Doc. 197, Laudon Decl.,

Ex. 6 (Otero Dep.) at 99-100.)  On June 28, 2018, Dr. Friedman sent a text message

to Rao and Giuliano stating that he did "not want any meetings,

communications, or contact of any kind, directly or indirectly, between Abbott

representatives and Dr. Moretta without my express permission from this point

forward."  (Doc. 202, Laudon Decl., Ex. 32 at l. 4664.)

On July 12, 2018, Giuliano and Dr. Friedman arranged a meeting with Rao,

which included Souder, to discuss this and other complaints Dr. Friedman had

about Rao's involvement in his practice.  (Doc. 197, Laudon Decl., Ex. 1 (Rao

8

Dep.) at 246-47; Ex. 3 (Friedman Dep.) at 31, 43.)  After the meeting that day,

Giuliano sent an email to Rao, Souder, Otero, and Dr. Friedman listing a number

of restrictions on Rao with regard to Dr. Friedman's practice.  (Doc. 202, Laudon

Decl., Ex. 9.)  Giuliano's email stated:

> 1-Tom will not interject in your relationships with any of your
> referral physicians by trying to do "damage control" or applying
> any interference whether insisting these intentions are good or not.
>
> 2-Tom will not implement himself in your case coverage or get in
> the way in the lab while you are working in Sebring or Bradenton.
> We will utilize clinical staff for your coverage unless there is a bind
> or manpower issue.
>
> 3-Tom will not call on the new EP coming into your group or try to
> court them with referrals or make any coincidental meetings with
> anyone inside your group or out.
>
> 4-Tom will not any longer vent to you about me or anyone else/give
> his personal opinions.  Professionalism will be followed.
>
> 5-Tom is committed to not reroute any of your business to Tony
> Pizzo or anyone else nor will he speak about your business or the
> dynamics in Sebring or anywhere else with Dr. Pizzo or other
> physicians alike.  Even though there are some level of personal
> relationships there between them he is committed to professionalism
> and confidentiality.
>
> 6-Tom will be focusing on other areas like Port Charlotte to further
> grow the Abbott footprint and staying away from your business
> platforms to adjust to your comfort level until further notice
> specifically by you.

(<u>Id.</u>)

According to Otero, the restrictions found in Giuliano's July 12, 2018 email did not prohibit Rao from continuing to work with other physicians at Bradenton Cardiology or restrict Rao from talking to doctors who referred patients to Bradenton and this was Rao's understanding as well.  (Doc. 197, Laudon Decl., Ex. 1 (Rao Dep.) at 248-53, 257-60; Ex. 6 (Otero Dep.) at 101-04.)  Bradenton had 11 physicians, and its doctors had the choice to refer to any of the three implanting physicians within it.  (<u>Id.,</u> Ex. 1 (Rao Dep.) at 251-53; Ex. 3 (Friedman Dep.) at 19-23.)  For instance, Rao's friend Dr. Pizzo shared many of the same referring physicians as Dr. Friedman from inside and outside of their clinic.  (<u>Id.,</u> Ex. 1 (Rao Dep.) at 162-63; Ex. 3 (Friedman Dep.) at 19-23; Doc. 217, Fisher Decl., Ex. 6 (Pizzo Dep.) at 82.)

### G.    August 2018 Lunch with Dr. Moretta and September Written Warning

Abbott claims Rao violated the conditions Giuliano set forth in the July 12, 2018 email by attending a lunch that included Dr. Moretta in August 2018.  (Doc. 196 at 7.)  Dr. Pizzo invited Rao to the lunch, which included another doctor from Bradenton Cardiology as well.  (Doc. 197, Laudon Decl., Ex. 1 (Rao Dep.) at 269-70; Doc. 217, Fisher Decl., Ex. 6 (Pizzo Dep.) at 177.)  Rao alleges he immediately

called Giuliano and asked him to let Dr. Friedman know about the lunch, but that Giuliano failed to inform Dr. Friedman.  (Doc. 197, Ex. 1 (Rao Dep.) at 269-72.)

When Dr. Friedman found out about the lunch, he complained to Giuliano and Otero that Rao had violated the commitments identified in Giuliano's July 12, 2018 email.  (Doc. 197, Laudon Decl., Ex. 6 (Otero Dep.) at 104-05; Ex. 3 (Friedman Dep.) at 39-42.)  After receiving these latest complaints from Dr. Friedman, Otero asked Giuliano to work with a human resources specialist at Abbott to issue Rao a written warning.  (Id., Ex. 6 (Otero Dep.) at 106-07; Doc. 202, Laudon Decl., Ex. 26.)

On September 5, 2018, Giuliano issued a written warning letter to Rao based on his alleged violation of the conditions found in Giuliano's July 12, 2018 email.  (Id.)  Giuliano noted in his email attaching his letter that Rao "chose to not sign the letter," even though Giuliano "would have preferred you did acknowledge and sign."  (Doc. 202, Laudon Decl., Ex. 26.)  Giuliano did not mention the lunch with Dr. Moretta in his letter but did state that Dr. Friedman had called him to complain that Rao had "discussed and agreed to look into scheduling a dinner meeting with a new cardiologist within Dr. Friedman's

group without his knowledge." (Id.)  In the letter, Giuliano restated the

conditions from his July 12, 2018 email and included additional "expectations"

for Rao. (Id.)  For example, Giuliano asked that Rao "remain professional and

constructive when you interact with your co-workers, customers and managers"

and "improve your collaboration and communication with [Giuliano]." (Id.)

### H.    Territory Manager Brian Giuliano

In 2017 and 2018, Rao and other members of his sales team made

numerous complaints to Abbott about Giuliano's abusive conduct in his role as

their Territory Manager.  Several team members resigned citing Giuliano as the

reason.

### 1.    Giuliano's Role After Abbott Acquired St. Jude

According to Abbott, after it acquired St. Jude in 2017, the company began

trying to increase revenue by rooting out inefficient practices like the overuse of

contingent workers.  (Doc. 197, Ex. 6 (Otero Dep.) at 196-97.)  Abbott tasked

Giuliano with implementing its desired changes for the Sarasota team as the

team's manager.  (Id.; Ex. 4, (Giuliano Dep.) at 47-48, 50-51.)

Rao alleges Giuliano tried to take "[t]otal control" over the team's

schedule.  (Id., Ex. 1 (Rao Dep.) at 61-62.)  For example, Rao asked a contingent

worker to attend an urgent visit for a patient in the emergency room; Giuliano

later told Rao that Abbott would not pay the worker for the visit because he had

not preapproved the visit.  (Doc. 202, Laudon Decl., Ex. 10.)  In other instances,

Giuliano chastised Rao for taking vacation days without obtaining Giuliano's

prior approval and asked that Rao provide him with a weekly sales call plan.

(Doc. 202, Laudon Decl., Exs. 16, 28.)  Other team members were unhappy that

Giuliano forced them to work evenings.  (Doc. 197, Laudon Decl., Ex. 2 (Curcio

Dep.) at 118-19.)

### 2.    Giuliano's Sexist, Derogatory, and Age-Related Comments

Giuliano frequently used profanity, insults, threats, and sexual references

in communicating with the Sarasota sales team.  Text messages Giuliano sent to

his team members reveal a wide array of vulgar language.  (See, e.g., Doc. 230,

Fisher Decl., Ex. 22 (Giuliano to Souder: "Just wanted to tell u I'm home

scratching my balls."); Ex. 23 (Giuliano to Rao: "Answer phone u crusty fuck");

Ex. 24 (Giuliano to Rao and Souder: "Then you 2 old fucks will bow b4 me.").)

Giuliano also made derogatory comments about the women on his team in

combination with his references to Rao's and Souder's age.  For example, in a

September 21, 2014, text to Rao and Souder, Giuliano wrote:

> No she where's a thong and proves shes a woman first. Then i get
> the sex pimp money off hotchkiss and Eckart. Florit does all the
> work and pays me for allowing him to say employed

13

u 3 get an award for longevity and forcefully get retired.

(Id., Ex. 25 (typographical errors in original).)

In his deposition, Giuliano admitted that he may have made "jokes" about Rao's age impacting his ability to learn new technology.  (Doc. 197, Laudon Decl., Ex. 4 (Giuliano Dep.) at 263-64.)  As noted above, Giuliano also insulted Rao and Souder based on their age, calling them "old fucks," "crusty," and "old farts," and telling them they "don't know how to work anymore."  (Doc. 197, Ex. 1 (Rao Dep.) at 327–28; Doc. 230, Fisher Decl., Exs. 23-25; Doc. 231, Fisher Decl., Ex. 22.) Another team member, Paul Mazurkewitz, corroborates the age-based insults Giuliano directed at Rao.  (Doc. 230, Fisher Decl., Ex. 14 (Mazurkewitz Decl.) ¶ 6.)  He recalls hearing Giuliano refer to Rao and others as "the old guys" and states that they did not understand "the new way" of doing business."  (Id.)

### 3.    October 2017 Ware Complaints Against Giuliano

In October 2017, Giuliano told a contingent worker named Gordon Ware that he was terminating his employment.  (Doc. 231, Fisher Decl., Ex. 32.)  Ware reported to Abbott management, including Otero, that Giuliano had been telling him to severely underreport the hours he worked and miles he drove for Abbott.

14

(Id.)  Ware stated that Rao and other team members had encouraged him to

report Giuliano's conduct to management.  (Id.)

Ware also reported abusive conduct by Giuliano to Abbott.  (Id. ("The

original incident was a call by Brian Giuliano out of the blue, immediately setting

up an extremely HOSTILE environment by starting off by using the F word.").)

Around the same time he made this report to Abbott, Ware began receiving a

series of aggressive text messages from Giuliano, telling Ware that he "just got

call from Otero you escalating questions over me . . . [c]all me if you have

questions not jose otero [sic]."  (Doc. 231, Fisher Decl., Ex. 33.)  At the same time

Giuliano sent similarly aggressive text messages to Rao about Ware.  (Doc. 230,

Fisher Decl., Ex. 31 at l. 1361 ("Gordon did some shit Gordon shouldn't have

done."), l. 1364 ("Fuck Gordon"), l. 1366 ("Gordon is done.").)  Giuliano also sent

Ware a text message stating, "[w]e will not be needing your services anymore."

(Doc. 231, Fisher Decl., Ex. 33.)

Ware reported Giuliano's behavior to Abbott human resources, telling

human resources he believed Giuliano had terminated him for retaliatory

reasons.  (Doc. 231, Fisher Decl., Ex. 34.)  Around this time, Giuliano told Rao, "U

better send a better text right now stating none of that was true and [Ware] is

15

bitter," and drafted a text message for Rao to send to Otero stating that Giuliano had done nothing wrong with regard to Ware.  (Doc. 230, Fisher Decl., Ex. 31 at ll. 1403-1404.)  Rao sent the text message to Otero.  (<u>Id.</u> at l. 1408.)

In November 2017, an Abbott human resources employee investigated Ware's complaints and interviewed Giuliano, Otero, and Rao.  (Doc. 202, Curcio Decl., Exs. 42-43; Doc. 231, Fisher Decl., Ex. 34.)  Internal notes from Abbott's investigator state that all three individuals, including Rao, denied any wrongdoing with regard to Ware.  (<u>Id.</u>)  Abbott did permit Ware to continue working for the company, but on January 16, 2018, he resigned because of "increasing tension" with Giuliano.  (Doc. 231, Fisher Decl., Ex. 35.)

### 4.    February 2018 Complaints Against Giuliano

In February 2018, several other members of the Sarasota team, including Leigh Stafford, Paul Mazurkewitz, and Renee Roscoe, reported to Otero, Skelly, and Abbott human resources that Giuliano was engaging in hostile, threatening, harassing, and discriminatory behavior toward team members on a regular basis. (Doc. 230, Fisher Decl., Ex. 14 ¶¶ 7-8; Ex. 18 ¶¶ 5-6; Ex. 19 ¶¶ 6-9; Doc. 231, Fisher Decl., Ex. 36.)  Otero interviewed these team members individually about their concerns.  (Doc. 230, Fisher Decl., Ex. 14 ¶ 7; Ex. 18 ¶ 5; Ex. 19 ¶ 8.)  These team members allege Otero was dismissive when they met with him and did not take

16

their concerns seriously.  (Id., Ex. 14 ¶¶ 8-10; Ex. 18 ¶¶ 6, 9; Ex. 19 ¶¶ 6-7, 9-10, 16.)

Skelly testified in a deposition that he had heard "concerns on the manner by which Mr. Otero conducted his business, used profanity and intimidation." (Doc. 230, Fisher Decl., Ex. 11 (Skelly Dep.) at 17.)  Skelly also testified that "[p]eople felt intimidated by Mr. Otero and felt or saw that very little happened with others who had voiced concerns," that Otero liked Giuliano and had promoted him, and that Otero and Giuliano had similar personalities.  (Id. at 18-20.)

As in the Ware investigation, Giuliano immediately found out about these new complaints against him. (Doc. 230, Ex. 14 ¶¶ 9, 15; Ex. 18, ¶¶ 6, 8; Ex. 19 ¶¶ 10, 16; Doc. 230, Fisher Decl., Ex. 27.)  Giuliano texted Rao stating that Otero had called and told him about the complaints and said he thought his team members were "rev[o]lting to hr."  (Doc. 230, Fisher Decl., Ex. 27.)  Giuliano also wrote to Rao, "[y]our boy . . . bad move" and stated that he "never forgets," which Rao alleges was meant as an accusation that Rao was responsible for the team's complaints.  (Doc. 229 at 9; Doc. 230, Fisher Decl., Ex. 26.)

17

### 5.   Abbott Initially Declines to Address the Complaints About Giuliano

Abbott received several other complaints about Giuliano during 2018.  In August 2018, Giuliano issued Roscoe a written warning and revoked a part of her compensation.  (Doc. 230, Fisher Decl., Ex. 18 ¶¶ 6-7; Doc. 231, Fisher Decl., Ex. 39.)  Roscoe believes the warning was retaliation for her participation in the team's complaints about Giuliano earlier that year.  (Doc. 230, Fisher Decl., Ex. 18 ¶¶ 6-7.)

Stafford alleges that Giuliano's abusive behavior toward her also worsened after the team's complaints about him.  (Doc. 230, Ex. 19 ¶ 10.) Stafford also alleges that she observed Giuliano retaliating against Rao for supporting her and the other team members who made the complaints.  (Id. ¶ 13.)  Stafford states she tried to report to Abbott human resources that Giuliano's behavior was worsening in the wake of the team's complaints, but she states she never received a response.  (Id. ¶ 12.)  In October 2018, Stafford resigned, telling Abbott in her exit interview that her resignation was due to Giuliano.  (Id., ¶ 15.)

Earlier, on June 1, 2018, Mazurkewitz also resigned and told Abbott that he did so because of the hostile work environment Giuliano created and Abbott's insufficient response to his team's complaints.  (Doc. 230, Fisher Decl., Ex. 14 ¶¶

18

2-4; Doc. 231, Fisher Decl., Ex. 44.)  Mazurkewitz alleges that when he resigned,

Giuliano threatened him, stating that he had better be careful what he said in his

exit interview.  (Doc. 230, Fisher Decl., Ex. 14 ¶ 16.)  Skelly testified that when he

tried to convince Mazurkewitz to return to Abbott, Mazurkewitz told him that

Giuliano had threatened to "punch [Mazurkewitz] in the face."  (Id., Ex. 11

(Skelly Dep.) at 49-50.)

On June 8, 2018, Giuliano sent Rao an email accusing Rao of telling Dr.

Friedman, whom he described as "one of my largest customers and friends,"

about Giuliano's role in Mazurkewitz's resignation.  (Doc. 231, Fisher Decl., Ex.

37.)  In the email, Giuliano told Rao that the "business is changing and going in a

different direction as I rebuild our team" and that he hoped Rao could "be a part

of the solution . . . not a part of the problem."  (Id.)  He also told Rao that if he

spoke about Giuliano again "in any type of unfavorable way that can hinder my

reputation" to customers or other Abbott employees, then Giuliano would "take

this to a higher level."  (Id.)  A few weeks after this exchange, Giuliano arranged

the July 12, 2018 meeting for Dr. Friedman to air his grievances about Rao's

alleged "interference" in his practice.

In late October 2018, Abbott eventually investigated Giuliano after Stafford resigned.  (Doc. 230, Fisher Decl., Ex. 19, ¶¶ 14-17; Doc. 202, Laudon Decl., Ex. 11.)  Jim Curcio, the same Abbott employee who had received the team's earlier complaints about Giuliano, also handled this investigation.  (Id. ¶¶ 16-17.)  In her exit interview, Stafford reiterated her early complaints about Giuliano and reported to Abbott that, like Mazurkewitz, Giuliano had physically threatened her and had even threatened her shortly before she completed her exit interview.  (Id., ¶ 15; Doc. 202, Laudon Decl., Ex. 11.)  Stafford also reported that Giuliano had sexually assaulted another team member two years earlier.  (Doc. 230, Fisher Decl., Ex. 19 ¶ 17; see also Ex. 6 (Jones Dep.) at 172-74.)

Curcio interviewed 14 of Giuliano's coworkers about the allegations against Giuliano, including interviewing Rao on October 17, 2018.  (Doc. 202, Laudon Decl., Ex. 11.)  Abbott claims this was the first time Rao ever complained about Giuliano to Abbott.  (Doc. 196 at 10.)  Rao denies this and alleges that he also complained to Otero and Skelly about Giuliano's conduct before he received the September 5, 2018 written warning from Giuliano, although he does not know the exact dates of these complaints.  (Doc. 197, Laudon Decl., Ex. 1 (Rao Dep.) at 67-71, 314-16.)

In his interview, Rao told Curcio that Giuliano was controlling and retaliatory, that Giuliano communicated inappropriately, including by using age-based insults against him and others on the team, and Rao also reported the sexual assault Stafford had also reported. (Doc. 202, Laudon Decl., Ex. 11; Doc. 202, Curcio Decl., Ex. 41; Doc. 197, Ex. 1 (Rao Dep.) at 69, 298.) Rao provided Curcio with emails and text messages to corroborate his reports. (Doc. 231, Fisher Decl., Ex. 3 (Curcio Dep.) at 177-84; Ex. 16 ¶ 5; Exs. 44-45.)

According to Rao, Giuliano said that if Rao lied to Abbott in its investigation of Giuliano, and got other team members to do the same, then Giuliano would resolve the issues Rao was having with Dr. Friedman. (Doc. 197, Laudon Decl., Ex. 1 (Rao Dep.) at 74; Doc. 230, Fisher Decl., Ex. 16 ¶ 6.) Giuliano blamed Rao for being the "driver" of the complaints against him and called Rao to tell him to speak favorably about Giuliano during the investigation. (Doc. 197, Laudon Decl., Ex. 1 (Rao Dep.) at 325-26; Ex. 4 (Giuliano Dep.) at 215-16.) Giuliano learned that Rao had provided examples of his communications to Abbott. (Doc. 197, Ex. 4 (Giuliano Dep.) at 216.)

Curcio also interviewed Kristina Jones during the investigation. (Id., Ex. 2 (Curcio Dep.) at 68-69.) Jones was initially Rao's co-plaintiff in this case. (See

21

Doc. 1, Complaint.)  Jones told Curcio that Giuliano had raped her in 2016.  (Doc.

197, Laudon Decl., Ex. 2 (Curcio Dep.) at 68-69; Doc. 230, Fisher Decl., Ex. 13 ¶ 5.)

Rao and other team members told Abbott human resources that they were

concerned Giuliano would retaliate against them because they had participated

in the investigation.  (Doc. 197, Laudon Decl., Ex. 2 (Curcio Dep.) at 54-55 ("I

recall individuals telling me they were worried about being retaliated against.");

Doc. 231, Fisher Decl., Ex. 62 at 5-7.)  One team member told Curcio that she was

so afraid of Giuliano that she had bought a gun for protection.  (Doc. 197,

Laudon Decl., Ex. 2 (Curcio Dep.) at 44.)

On November 2, 2018, Curcio issued his investigative findings regarding

Giuliano.  (Doc. 231, Fisher Decl., Ex. 42.)  Curcio concluded that Giuliano had

displayed a "significant lack of professionalism," but that his findings on the

sexual assault, drug use, and other allegations against Giuliano were

inconclusive.  (Id.)  Curcio concluded that some members of Giuliano's team

"strongly resented" him "for implementing business changes" and he noted that

Rao and Souder "would have substantial monetary gain if Giuliano's

employment with Abbott was terminated."  (Id.)  Curcio recommended Giuliano

be allowed to return from suspension with a written warning.  (Id.)

22

On November 7, 2018, Abbott reinstated Giuliano based on Curcio's findings.  (Doc. 202, Laudon Decl., Ex. 12; Ex. 32 at 7646.)  Abbott issued Giuliano a written warning.  (Id., Ex. 12.)

Giuliano testified that when he returned from suspension, he refused to speak to Rao because he was angry about Rao's role in giving Abbott his text messages and building a negative narrative about him.  (Doc. 197, Laudon Decl., Ex. 4 (Giuliano Dep.) at 234.)  While Giuliano was on suspension, he had asked Dr. Friedman to contact Abbott to support him.  (Id. at 243; Ex. 3 (Friedman Dep.) at 60-61.)  Dr. Friedman testified that Giuliano told him that Rao was to blame for rallying the Sarasota team against Giuliano and that Rao was trying to get Giuliano fired.  (Id., Ex. 3 (Friedman Dep.) at 17-19, 79.)  Dr. Friedman also testified that he got the impression from Giuliano that he should escalate a complaint about Rao to upper management at Abbott.  (Id. at 65-66.)

## I.      November 2018 Dinner Invitation to Dr. Friedman

Just days after Giuliano returned from suspension, Dr. Friedman called Otero to complain about Rao and, on November 11, 2018, Dr. Friedman emailed Otero a letter detailing his complaints.  (Doc. 202, Laudon Decl., Ex. 20; Ex. 25.) Dr. Friedman stated he was "extremely upset" that Rao was continuing to "interfere" in his practice.  (Id.)  Dr. Friedman's complaint was based on his

learning that Rao had set up a dinner with a few of Dr. Friedman's referring physicians. (Id.) Rao asserts that Giuliano drafted the email about Rao for Dr. Friedman to send to Otero. (Doc. 197, Laudon Decl., Ex. 1 (Rao Dep.) at 275-76.) In his letter, Dr. Friedman demanded that Abbott terminate Rao. (Doc. 197, Laudon Decl., Ex. 20.)

Rao claims he set up the dinner at the request of two other doctors from Dr. Friedman's clinic in order to discuss structural heart matters with them, which were outside of Dr. Friedman's area of practice. (Doc. 197, Ex. 1 (Rao Dep.) at 155-63, 253.) Rao alleges another doctor who worked with both Dr. Pizzo and Dr. Friedman, Dr. Nguyen, sent an initial invitation to the dinner by text message and then Rao sent another follow up invitation. (Id. at 155-56.) Rao testified that he only copied Dr. Friedman on the follow up invitation in an effort to be "transparent" with Dr. Friedman. (Id. at 163.)

Dr. Friedman admits that when he complained about Rao he was concerned about Abbott potentially terminating Giuliano instead of Rao. (Doc. 197, Laudon Decl., Ex. 3 (Friedman Dep.) at 64.) But Dr. Friedman claims Giuliano did not write the letter he sent to Otero. (Id. at 70.)

**J.**     **Abbott Terminates Rao**

The day after he received Dr. Friedman's letter, November 12, 2018, Otero

forwarded Dr. Friedman's letter to Abbott human resources and requested that

Rao be reviewed for termination.  (Doc. 202, Laudon Decl., Exs. 20, 25.)  On

November 30, 2018, Abbott suspended Rao without pay.  (Doc. 197, Ex. 1 (Rao

Dep.) at 101.)

During his suspension, Rao communicated with at least seven Abbott

customers through either incoming or outgoing calls.  (Doc. 240, Swangstue

Decl., Ex. 27 at 5-18.)  Rao also told Abbott colleague Bryan Brust that if Abbott

terminated him, he would take his business from Abbott, particularly his

business with Dr. Pizzo and Dr. Popper.  (Doc. 217, Fisher Decl., Ex. 1 (Brust

Dep.) at 80.)  Brust also testified that Rao told him that Rao would bring other

Abbott employees with him if Abbott terminated him.  (Id.)  On December 13,

2018, Rao exchanged text messages with Jones regarding his desire to take her

and another team member, Lynne Renfroe, with him to a new employer if he was

terminated.  (Doc. 240, Swangstue Decl., Ex. 27 at ll. 557-63.)

On December 4, 2018, Renfroe sent Otero a letter stating that she would be

resigning from the company effective December 18, 2018.  (Doc. 230, Fisher Decl.,

Ex. 49.)  Renfroe stated she was upset that Abbott let Giuliano "get away with his

behavior" when she resigned and that she was afraid of him. (<u>Id.</u>, Ex. 17 ¶¶ 9-13.)

Abbott employee relations investigator Karen Punzalan reviewed Dr. Friedman's November 2018 complaint about Rao and determined that Rao's actions violated the instructions in the September 5, 2018 warning letter he received from Giuliano. (Doc. 202, Laudon Decl., Ex. 14.) Punzalan recommended that Rao's employment be terminated. (<u>Id.</u>; Doc. 198, Hawks Decl. ¶ 3; Doc. 197, Ex. 6 (Otero Dep.) at 203-06.) On December 14, 2018, Abbott terminated Rao's employment. (Doc. 202, Laudon Decl., Ex. 29.) Rao was 59 years old at the time he was terminated. (Doc. 198, Hawks Decl. ¶ 5.) Abbott replaced Rao with Ernie Mason, a sales representative who was 54 years old at that time. (<u>Id.</u>)

### K.   Changes to Abbott Team After Rao's Termination

On April 3, 2019, Abbott terminated Giuliano after he berated another employee and lied to Abbott human resources about it. (Doc. 197, Ex. 2 (Curcio Dep.) at 56-57, 237-39; Doc. 231, Fisher Decl., Ex. 52.) The employee reported that Giuliano had "used foul language and made her feel intimidated" by yelling at her about the loss of a key customer due to Rao's termination. (<u>Id.</u>)

On June 19, 2019, Renee Roscoe also resigned from Abbott because of how Abbott handled her complaints about Giuliano and because she felt she could not trust Otero.  (Doc. 230, Fisher Decl., Ex. 18 ¶¶ 3, 11; Doc. 231, Fisher Decl., Ex. 53.) Both Roscoe and Jones state that they were so afraid of Giuliano that they have purchased guns to protect themselves from him.  (Doc. 230, Fisher Decl., Ex. 13 ¶ 16, Ex. 18 ¶ 12.)

### L.   Rao's Interactions with Restricted Customers and Abbott's Competitors Following his Termination

Shortly after Abbott terminated Rao on December 14, 2018, he contacted two competing companies by phone, Boston Scientific and Biotronik.  (Doc. 240, Swangstue Decl., Ex. 27 at ll. 595, 770.)  Abbott alleges that Rao also called ten "restricted" physicians or contacts on the day he was terminated.  (Id. at 19-25.) He spoke with Dr. Pizzo multiple times and sent text messages to other doctors. (Id. at 19-25, ll. 680, 685, 717.)

On December 17, Rao sent a text message to a regional sales manager at Boston Scientific, John Larkin, and said: "John . . . I in good faith have been moving business your way.  I look forward to speaking with you soon with regards to employment."  (Id., Ex. 27 at 29, l. 788.)  In January 2019, when Larkin had still not heard back from his superiors about hiring Rao, Rao wrote: "Ok . . .

I'll hang tight.  I just want to convert everyone now.  I'll hold off until we know.

Customers are ready to switch.  Getting calls weekly.  I've asked them to be

patient and told them I'll keep them updated."  (Id. at 45, ll. 1225-1226.)

     After a ten-minute telephone conversation with restricted customer Dr.

Parnassa on December 18, Rao texted him: "Your [sic] my friend and I respect

anything that makes you feel comfortable."  (Doc. 240, Swangstue Decl., Ex. 27 at

32, line 868, 873-76.)  Parnassa replied: "All is good."  (Id.)  Rao responded: "We

both need to be careful.  I appreciate you more then [sic] you could know."  (Id.)

     On December 24, 2018, Rao sent Biotronik's regional sales director Rory

Carmichael an email with his proposed terms for employment, proposing to

cover the same territory he had covered for Abbott, and telling Carmichael that

he "will be able to maintain these customers upon signing."  (Doc. 240, Laudon

Decl., Ex. 12.)

     During this period, Abbott lost significant business in Rao's territory.

(Doc. 230, Ex. 11 (Skelly Dep.) at 79, 84.)  Skelly, however, testified that Abbott

has "no evidence" and that "no direct conversations were had or reported"

concerning whether Rao solicited these customers to move their business

elsewhere.  (Id.)  Otero similarly testified that he did not have any evidence that

Rao was soliciting customers to move their business away from Abbott, only that Abbott's sales numbers reflected a loss of business following Rao's termination. (Doc. 197, Ex. 6 (Otero Dep.) at 170-73 (Otero: "Do I have any evidence? I don't have any evidence.").)

In December 2018 and January 2019, Abbott's counsel sent letters to Rao as well as to companies with which Rao was trying to obtain new employment advising them of Rao's non-compete and other contractual obligations to Abbott. (Doc. 170, Laudon Decl., Exs. 21-22; Doc. 235, Laudon Decl., Ex. 26; Doc. 240, Laudon Decl., Ex. 11.)

Rao was unemployed for six months.  (Doc. 197, Ex. 1 (Rao Dep.) at 130.) On June 24, 2019, Rao signed an employment agreement with Biotronik.  (Id. at 193-95; Doc. 240, Laudon Decl., Ex. 7.)  On July 8, 2019, Rao began working for Biotronik as a CRM sales representative covering the same territory he had for Abbott.  (Id.)  Biotronik also hired Roscoe and Jones in 2019.  (Doc. 240, Laudon Decl., Exs. 5–6.)

According to Rao, Biotronik placed him on a guaranteed salary for the first six months with the understanding that he would not do CRM-related work until after his non-compete with Abbott expired.  (Doc. 197, Ex. 1 (Rao Dep.) at 193-

95.)  Rao asserts that he provided Biotronik with a list of medical centers from his Abbott "Restricted List" ("Restricted Customers").  (Id. at 191-92, 331.)

Biotronik supervisor Rory Carmichael testified that when Rao started at Biotronik, he knew Rao had five or six months left on the non-compete, and that he made it clear to Rao that he could not sell to prior customers for the remaining term of the non-compete.  (Doc. 217, Fisher Decl., Ex. 2 (Carmichael Dep.) at 94-98.)  Biotronik provided Rao with training on a separate product from CRM devices, stents, which Rao had not sold before.  (Doc. 197, Laudon Decl., Ex. 1 (Rao Dep.) at 38, 195-201; Ex. 6 (Otero Dep.) at 78.)  Once Rao was trained, Biotronik expected him to help in areas other than those restricted by the non-compete, such as the Tampa territory, until his non-compete ended on December 14, 2019.  (Doc. 217, Fisher Decl., Ex. 2 (Carmichael Dep.) at 115-16.)

### 1.    Rao's Contact with Restricted Physicians

During his non-compete period, Rao states that he met and communicated with Drs. Pizzo, Popper, Nandigam, and Sambandam about Biotronik stents. (Id., Ex. 1 (Rao Dep.) at 40, 119, 195-96.)

Rao is personal friends with Drs. Pizzo and Popper.  (Id. at 118-19.)  Rao alleges that he did not discuss CRM devices with them during the non-compete period.  (Id.)  Dr. Pizzo corroborates this allegation even though he eventually

decided to switch to Biotronik CRM devices, testifying that he did so because

"this is where [Rao's] going to land and . . . I knew when he was back to work,

the level of service I was used to would return." (Doc. 230, Fisher Decl., Ex. 8

(Pizzo Dep.) at 35-36, 125-26, 129.) Shortly after Rao signed his Biotronik

employment agreement, a Biotronik employee named Bryant Davies reached out

to Dr. Pizzo to introduce himself. (Id. at 125-26.) Davies had never met Dr. Pizzo

before or sold him Biotronik products. (Doc. 217, Fisher Decl., Ex. 3 (Davies

Dep.) at 90.)

　　　While Bob Souder and Ernie Mason (Rao's Abbott replacement) were at

the offices of Dr. Bala Nandigam during the term of Rao's non-compete, Souder

testified that he saw what he believed to be Rao's handwriting on a patient chart,

indicating that Rao had performed a device check on a patient with an Abbott

device. (Doc. 230, Fisher Decl., Ex. 12 (Souder Dep.) at 137-39.) Souder also

testified that someone in Dr. Nandigam's office told him that Rao had checked a

patient's device. (Id.) Mason also alleges that when he performed a device check

on Dr. Sambandam's patient, he looked through the patient's charts and noticed

that the device had been checked on December 10, 2019 by someone other than

an Abbott employee.  (Doc. 238, Mason Decl. ¶ 4.)  Mason alleges he observed

Rao's signature on the bottom of the chart.  (Id.)

Another Abbott employee, Marc Leber, alleges that a nurse at Dr. Popper's

office told him that Rao had visited the office sometime in fall 2019.  (Doc. 239,

Leber Decl. ¶ 5.)  Leber also alleges the nurse told him that Rao had distributed

Biotronik CRM promotional materials at the office and "said negative things

about Abbott."  (Id.)  Leber states that once when he arrived at Dr. Popper's

office to perform device checks, the front desk employees expressed surprise to

see him because Rao had just visited.  (Id. ¶ 6.)  Leber alleges that in "early

December 2019," he saw Rao in the catheter lab at Fawcett Memorial Hospital, a

customer Leber had "been told Rao worked with as an Abbott employee."  (Id. ¶

9.)  Leber also claims that in mid-October 2019, Dr. Dunham told him that Dr.

Popper would no longer be using Abbott to perform device checks at his clinic,

and that a clinic nurse told Leber that it was because Biotronik was taking over

the device checks, even for Abbott products.  (Id. ¶¶ 7-8.)

Biotronik expense reports show that Rao sought reimbursement for meals

with restricted customers during his non-compete period for discussing stents,

Biotronik's suspended radiation protection system, and the company's MoMe

Kardia product.  (Doc. 240, Laudon Decl., Exs. 16–21.)  At oral argument, Abbott

stated that the MoMe product competes against Abbott's monitoring devices.

Souder also testified that Dr. Popper told him that during these meals with Rao,

he promoted Biotronik's CRM products and encouraged Dr. Popper to use them.

(Doc. 230, Fisher Decl., Ex. 12 (Souder Dep.) at 129-30, 140.)

Phone records also show that during the time Rao worked for Biotronik

and was subject to the non-compete, he talked to multiple Restricted Customers

on the phone.  (Doc. 240, Swangstue Decl., Ex. 27 at 83-128.)

Rao also helped maintain a shared electronic calendar with his new sales

team at Biotronik, which included appointments related to Biotronik's CRM

business in Rao's former Abbott territory.  (Doc. 197, Ex. 1 (Rao Dep.) at 208-09,

226; Ex. 7 (Roscoe Dep.) at 188-89; Doc. 240, Swangstue Decl., Ex. 28.)  Rao

testified that this was the calendar that his Biotronik "team was going to be using

when [Rao] came off of [his] noncompete."  (Doc. 197, Ex. 1 (Rao Dep.) at 226.)

Davies and Rao explained that Rao was included on the shared calendar because

the whole team would use the calendar for follow ups, clinic and device checks,

and repeating entries once Rao was no longer subject to his non-compete.  (Id. at

226; Doc. 217, Fisher Decl., Ex. 3 (Davies Dep.) at 68-69, 77-78.)  Rao and his other

Biotronik team members added appointments to the calendar with doctors who were Restricted Customers.  (Id. at 210-11; Doc. 240, Swangstue Decl., Ex. 28.) Rao testified that if he made a calendar entry related to a specific CRM procedure, which he does not recall doing, it would have been because his Biotronik colleagues had asked him to do so, not because he was involved in the procedure himself.  (Doc. 197, Ex. 1 (Rao Dep.) at 214-16.)

Roscoe testified that if Biotronik employees had a question about the doctors and hospitals that she and Rao had serviced at Abbott, she would give them that information, such as where the office was located or what the doctor liked.  (Doc. 230, Ex. 10 (Roscoe Dep.) at 189-90; Doc. 240, Laudon Decl., Ex. 15.) But Roscoe testified that she did not know if Rao also shared that type of information with Biotronik.  (Id. at 190.)  Davies testified that Rao never talked about Restricted Customers during his non-compete period and was never involved in scheduling procedures with them.  (Doc. 217, Fisher Decl., Ex. 3 (Davies Dep.) at 57-60, 70-71.)

### 2.    Biotronik Sales Data & Defendants' Discovery Responses

Biotronik sales data shows that Rao was not identified as the sales representative for any of his Restricted Customers during his non-compete period.  (Doc. 217, Fisher Decl. ¶ 3.)  However, during discovery, Abbott

identified 20 doctors who were restricted customers and with whom it alleges

Rao violated his non-compete.  Abbott's specific allegations and the evidence to

support those allegations is addressed in more detail below in the discussion on

Rao's Motion for Partial Summary Judgment.

Briefly, of the 20 doctors, Biotronik sales data only reflects sales to seven

during the non-compete period.  (Doc. 217, Fisher Decl. ¶ 6.)  Six of the seven

were already doing business with Biotronik before Rao started working for

Biotronik on July 8, 2019.  (Id.)  Defendants' damages expert, Yogesh Bahl, only

calculates damages from lost sales to five Restricted Customers.  (Doc. 218, Fisher

Decl., Ex. 13 (Bahl Report) ¶ 48.)

In February 2020, Rao and another Biotronik sales representative had a

dispute as to how they would split commissions for the Port Charlotte, Florida

area once Rao came off his non-compete.  (Doc. 217, Laudon Decl., Ex. 2

(Carmichael Dep.) at 134.)  Port Charlotte was in Rao's former Abbott territory.

(Id.)  During this dispute, Rao circulated a spreadsheet at Biotronik showing

revenue generated in Port Charlotte from July 2019 (Rao's start date) to February

2020.  (Doc. 240, Laudon Decl., Ex. 3.)  Rao claims that he and the sales

representative were only trying to figure out how to calculate his commission

split after Rao was done with his non-compete and that he was not claiming any commissions that were generated in that territory during his non-compete.  (Doc. 197, Laudon Decl., Ex. 1 (Rao Dep.) at 236-40; Doc. 217, Laudon Decl., Ex. 2 (Carmichael Dep.) at 134.)

Other facts will be discussed below as necessary.

## III.   DISCUSSION

Abbott has moved for summary judgment on all of Rao's claims.  (Doc. 194.)  Abbott has also moved for sanctions against Rao for alleged spoliation of evidence (Doc. 166) and to exclude Rao's expert witness on damages (Doc. 205). Rao has moved for partial summary judgment on Defendant St. Jude's[2] counterclaims, seeking partial dismissal of its breach of contract counterclaim. (Doc. 214.)  Rao also moves for bifurcation of the trial.  (Doc. 189.)

### A.   The Parties' Summary Judgment Motions

#### 1.   Summary Judgment Standard

Summary judgment is appropriate if, viewing all facts in the light most favorable to the non-moving party, there is no genuine dispute as to any material fact, and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ.

_____

[2] Only Defendant St. Jude Medical S.C., Inc. ("St. Jude") brings counterclaims against Rao.  (<u>See</u> Doc. 139 ¶¶ 81-85.)

P. 56(a); <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322-23 (1986).  The party seeking

summary judgment bears the burden of showing that there is no disputed issue

of material fact.  <u>Id.</u> at 323.  "A dispute is genuine if the evidence is such that it

could cause a reasonable jury to return a verdict for either party; a fact is material

if its resolution affects the outcome of the case."  <u>Amini v. City of Minneapolis</u>,

643 F.3d 1068, 1074 (8th Cir. 2011) (citing <u>Anderson v. Liberty Lobby, Inc.</u>, 477

U.S. 242, 248, 252 (1986)).

### 2.   Defendants' Motion for Summary Judgment

#### a)   Plaintiff's Breach of Contract Claim (Count 1)

Rao claims Abbott breached his Employment Agreement by terminating

him without cause and by failing to pay him the appropriate amount of

commission.

"The elements of a breach of contract claim are (1) formation of a contract,

(2) performance by plaintiff of any conditions precedent to his right to demand

performance by the defendant, and (3) breach of the contract by defendant."

<u>Lyon Fin. Servs., Inc. v. Ill. Paper & Copier Co.</u>, 848 N.W.2d 539, 543 (Minn. 2014)

(citation omitted).  "Liability for breach of contract requires proof that damages

resulted from or were caused by the breach."  <u>Border State Bank of Greenbush v.</u>

<u>Bagley Livestock Exchange, Inc.</u>, 690 N.W.2d 326, 336 (Minn. Ct. App. 2004)

(citation omitted).

As it relates to the first aspect of Rao's breach of contract claim, Rao's

Employment Agreement permits termination for "cause," which is defined to

include "negligence or willful misconduct with respect to . . . [Abbott's]

customers or potential customers" and "failure to perform Employee's duties as

reasonably directed by [Abbott] following notice of such failure and a reasonable

opportunity for Employee to remedy or cure any such failure." (Doc. 198,

Hawks Decl., Ex. 34 ¶ 5(D).)

Abbott argues that it did not breach Rao's Employment Agreement by

terminating him because it had "cause" to do so. Abbott alleges that Dr.

Friedman had many complaints about Rao over the years. Of particular

relevance, in July 2018, Giuliano warned Rao, at Dr. Friedman's request, not to

involve himself in Dr. Friedman's referrals or recruitment of new physicians to

his practice. (Doc. 202, Laudon Decl., Ex. 9.) Within a few weeks, however, Rao

attended a lunch with Dr. Moretta, a physician Dr. Friedman was recruiting to

his practice. As a result, in September 2018 Giuliano gave Rao another written

warning. (Doc. 202, Laudon Decl., Ex. 26.)

38

After receiving the second warning, Abbott alleges Rao violated it by inviting Dr. Friedman to a dinner in November with four of Dr. Friedman's referring physicians.  (Doc. 202, Laudon Decl., Ex. 20; Ex. 25.)  Rao failed to confer with Giuliano or any of his other supervisors at Abbott prior to sending the invitation.  Based on these events, Abbott argues Rao was negligent or committed willful misconduct toward a customer, and that he failed to perform his duties as reasonably directed by Abbott following notice of such failure, thus giving Abbott cause to terminate him.

Rao responds that the conditions Giuliano placed on him in his two warnings were vague and a reasonable jury could conclude that Rao did not violate them by having lunch with Dr. Moretta or by later inviting Dr. Friedman to dinner.  The Court agrees.  A reasonable jury could determine that these actions did not violate Giuliano's warnings and, therefore, were not failures of Rao to perform his job duties as directed.  A reasonable jury could also conclude that these actions did not amount to "negligence" or "willful misconduct" toward an Abbott customer under the Employment Agreement.

Indeed, Rao argues that his lunch with Dr. Moretta did not violate Giuliano's July 2018 warning at all because he only attended the lunch at the

request of Dr. Pizzo, who just happened to be headed to lunch with Dr. Moretta that day and invited Rao to come along.  (Doc. 197, Laudon Decl., Ex. 1 (Rao Dep.) at 269-70; Doc. 217, Fisher Decl., Ex. 6 (Pizzo Dep.) at 177.)  Rao also contends he only scheduled the November dinner at the request of two other doctors who worked with Dr. Friedman at the same clinic.  (Doc. 197, Ex. 1 (Rao Dep.) at 155-63, 253.)  Rao also argues that the purpose of the dinner was to discuss structural heart business, an area in which Dr. Friedman does not practice, meaning such discussions could not "interfere" in Dr. Friedman's practice.  It is clear that Giuliano's warnings to Rao did not bar him from all communications with the other physicians at Bradenton Cardiology, just from "interfering" in Dr. Friedman's practice or relationships with referring physicians.  There are disputes of material fact precluding summary judgment as to whether Rao's conduct violated Giuliano's vague directives, meaning Rao's breach of contract claim for improper termination must be resolved by a jury.

Next, Rao asserts that Abbott did not pay him the proper amount of commission he was owed under his Employment Agreement when it terminated him.  Rao conceded in his deposition, however, that he does not know how much money he is owed for unpaid commission.  (Doc. 197, Ex. 1 (Rao Dep.) at 320-21.)

40

Rao's only basis for claiming he was underpaid commission is that he believes Souder was paid more than him.  (Id.)  Rao, therefore, presents no evidence beyond his own speculation that he was actually paid less in commission than he was owed under his agreements with Abbott.

If there was a genuine factual dispute over unpaid commission from Rao's time at Abbott, Rao should be able to direct the Court to evidence to demonstrate as much.  Abbott claims it has produced all of Rao's payroll reports and the commission reports for his sales team members, and discovery is now closed.  It would be speculative for a jury to award Rao damages for unpaid commission based solely on Rao's unsupported allegations.  The Court, therefore, grants summary judgment to Abbott on Rao's breach of contract claim for unpaid commission from the period when Rao was still employed at Abbott.

> **b)** **Plaintiff's Retaliation Claims (Count 3: Retaliation under Florida's Private Sector Whistleblower Act (Fla. Stat. § 448.102, et. seq.); Count 7: Retaliation in Violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-3; Count 9: Retaliation in Violation of the Florida Civil Rights Act, (Fla. Stat. § 760.01, et seq.))**

The parties present competing timelines in support of their arguments on Rao's claims that Abbott unlawfully discharged him in retaliation for reporting

Giuliano's misconduct.  Abbott argues that all of Rao's retaliation claims fail

because, to the extent Rao engaged in protected conduct by reporting Giuliano,

that participation occurred after Rao had already received a written warning,

meaning Rao was terminated for violating that written warning by interfering in

Dr. Friedman's practice.  Based on these facts, Abbott argues that Rao cannot

establish a causal connection between any protected activity he may have

engaged in and his termination because Abbott had legitimate reasons for

terminating him and did so without the involvement of Giuliano.

At the federal level, Title VII prohibits retaliation against an employee

"because he has opposed any practice made an unlawful employment practice

by [Title VII], or because he has made a charge, testified, assisted, or participated

in any manner in an investigation, proceeding, or hearing under [Title VII].  42

U.S.C. § 2000e-3(a).  The Florida Civil Rights Act similarly prohibits an employer

from discriminating against an employee "because that person has opposed any

practice which is an unlawful employment practice under this section, or because

that person has made a charge, testified, assisted, or participated in any manner

in an investigation, proceeding, or hearing under this section."  Fla. Stat. §

760.10(7).

Because the Florida Human Rights Act is based on Title VII, case law

dealing with Title VII applies to both claims.  See, e.g., Kelly v. K.D. Const. of

Florida, Inc., 866 F. Supp. 1406, 1411 (S.D. Fla. 1994); Palm Beach Cnty. Sch. Bd. v.

Wright, 217 So. 3d 163, 164-65 (Fla. Dist. Ct. App. 2017).

> To survive a motion for summary judgment on a retaliation claim, a
> plaintiff must offer direct evidence of retaliation or create an
> inference of retaliation under the McDonnell Douglas burden-
> shifting framework.  Direct evidence in this context is not the
> converse of circumstantial evidence.  Rather, direct refers to the
> causal strength of the proof.  The plaintiff's ultimate burden in a
> Title VII retaliation case is to prove an impermissible retaliatory
> motive was the "but-for cause" of the adverse employment action.

Donathan v. Oakley Grain, Inc., 861 F.3d 735, 739–40 (8th Cir. 2017) (cleaned up

and citations omitted).

Under McDonnell Douglas, "the plaintiff bears the initial burden to

establish a prima facie case.  This burden requires the plaintiff to demonstrate

she participated in protected conduct and suffered an adverse employment

action.  The plaintiff must also demonstrate a causal connection between the

protected conduct and the adverse action.  The burden to show a prima facie case

is not difficult."  Donathan, 861 F.3d at 740 (citations omitted).  "[T]he burden

then shifts to the employer to articulate a legitimate, non-retaliatory reason for

the adverse employment action."  Id.

43

> If the employer articulates a legitimate reason for the adverse
> employment action, the plaintiff may create a triable question as to
> retaliation by showing the employer's articulated reason was not the
> true reason for the adverse action.  On a fully developed summary
> judgment record, this final step of the burden-shifting analysis
> merges with the ultimate burden of proof which remains at all times
> on the plaintiff.

Id. (citations and footnote omitted).

Rao does not argue the direct evidence analysis applies; therefore, the

Court proceeds to analyze whether Rao has presented sufficient circumstantial

evidence to survive summary judgment on his retaliation claims.

### i)   Prima Facie Case

Rao has established a prima facie case of retaliation.  Abbott admits that

Rao engaged in protected activity at least as early as October 17, 2018 when he

participated in the investigation of Giuliano.  Abbott also admits that it took at

least one adverse employment action against Rao after he engaged in protected

activity by suspending and then terminating his employment.

Rao has also provided sufficient evidence of causation to withstand

summary judgment based on the temporal proximity between Rao's

participation in the investigation of Giuliano on October 17, 2018 and his

suspension just six weeks later on November 30, 2018.  Further, Abbott opened a

44

termination review into Rao on November 12, 2018, just days after Giuliano

returned from suspension.  See Sprenger v. Fed. Home Loan Bank of Des Moines,

253 F.3d 1106, 1113-1114 (8th Cir. 2001) (noting that "a 'matter of weeks' between

a protected activity and an adverse employment action was sufficient to satisfy

the causation element of a prima facie case of retaliation").

Rao has also provided additional evidence of a causal connection beyond

temporal proximity based on his "cat's paw theory" of causation.  In the context

of employment discrimination, a "cat's paw case" is one in which an employee

seeks "to hold his employer liable for the animus of a supervisor who was not

charged with making the ultimate employment decision."  Staub v. Proctor

Hosp., 562 U.S. 411, 415 (2011); see also Qamhiyah v. Iowa State Univ. of Sci. &

Tech., 566 F.3d 733, 742 (8th Cir. 2009) ("An employer cannot shield itself from

liability for unlawful termination by using a purportedly independent person or

committee as the decisionmaker where the decisionmaker merely serves as the

conduit, vehicle, or rubber stamp by which another achieves his or her unlawful

design.").  The cat's paw theory supports the causation element of Rao's

retaliation claims here because even though Giuliano was not officially involved

in making the decision to terminate Rao, Rao argues the decision was the

45

outcome of Giuliano's plan to get Abbott to terminate Rao for reporting Giuliano's misconduct.

Rao argues that Giuliano showed a pattern of interfering in Abbott's investigations of complaints against him and then retaliating against those who reported him or did not support him.  Rao points out that Giuliano knew before Rao was terminated that Rao had provided text messages and other information to Abbott about Giuliano's misconduct.  Rao argues that, while Giuliano was on suspension in October and November 2018, he sought out his friend and business partner Dr. Friedman to help get Rao terminated.  Rao alleges Giuliano influenced Dr. Friedman to seek Rao's termination in November over a trivial event, namely Rao's decision to invite Dr. Friedman to a dinner.

Rao also points to evidence that Otero was a strong supporter of Giuliano, who had dismissed the Sarasota team's complaints and leaked them to Giuliano in the past.  Rao notes that Giuliano had a pattern of retaliating against team members who complained about him, noting that several members of Giuliano's team quit due to the hostile work environment Giuliano created.  Giuliano even admitted that he blamed Rao for being the "driver" of complaints against him and that he could make Rao's problems with Dr. Friedman go away if he

46

supported Giuliano, implying that he could do the opposite if Rao did not support him.  (Doc. 183, Fisher Decl., Ex. 38 at 1 (Giuliano telling Rao that he had the power to "wash away this Friedman thing").)

The preceding evidence satisfies the causation element of Rao's retaliation claims for the purpose of establishing a prima facie case.  There is essentially no dispute over the other two elements of Rao's retaliation claims; Rao engaged in protected activity by reporting Giuliano and he suffered an adverse action when Abbott terminated him.  Rao has, therefore, satisfied the first step of the McDonnell Douglas framework for the purposes of summary judgment.

**ii)      Abbott has Articulated a Legitimate, Non-Retaliatory Reason for Rao's Termination**

Abbott has similarly satisfied its burden in the McDonnell Douglas analysis by identifying a "legitimate, non-retaliatory reason" for its decision to terminate Rao.  Abbott claims it terminated Rao for violating Giuliano's warnings regarding interference in Dr. Friedman's practice.  See, e.g., Putman v. Unity Health Sys., 348 F.3d 732, 736 (8th Cir. 2003) ("Our cases have repeatedly held that insubordination and violation of company policy are legitimate reasons for termination.") (citation omitted).

**iii)     Material Factual Disputes Regarding Pretext Remain**

47

In analyzing a retaliation claim at the pretext portion of the <u>McDonnell Douglas</u> framework, "[t]he question is whether [Abbott's] articulated reasons for discharge were a pretext for retaliation, not whether [Rao] actually did what he was accused of doing or whether discharge was warranted." <u>Grey v. City of Oak Grove</u>, 396 F.3d 1031, 1035 (8th Cir. 2005) (citing <u>Dhyne v. Meiners Thriftway, Inc.</u>, 184 F.3d 983, 989 (8th Cir. 1999)).  To show pretext, Rao "must both discredit defendants' asserted reasons for his termination and show that the circumstances permit drawing a reasonable inference that the real reason for his termination was retaliation."  <u>Hutton v. Maynard</u>, 812 F.3d 679, 684 (8th Cir. 2016) (citation omitted).

Abbott argues that Rao cannot show pretext because he admits he engaged in the conduct for which Abbott terminated him by having lunch with Dr. Moretta and setting up the dinner in November 2018.  Abbott argues this conduct violated his promises not to "interfere" in Dr. Friedman's practice or "involve" himself in Dr. Friedman's referrals.  The problem for Abbott is that terms like "interfere" are vague and susceptible to different interpretations by reasonable minds.  For his part, Rao claims he did not intend to violate Giuliano's prohibitions through his conduct in either August or November 2018.

48

There are material fact issues regarding the truth of Abbott's claim that Rao's alleged violations of Giuliano's warnings were the true cause of his termination.  The restrictions in Giuliano's warnings were unclear and perhaps unworkable, and there is conflicting evidence regarding whether Rao even violated them.  Further, and to the extent Abbott attempts to rely on evidence of earlier complaints in Rao's personnel record, the record shows that it is not unusual for doctors to bar certain sales representatives from their practices. (Doc. 197, Ex. 6 (Otero Dep.) at 82.)

The evidence Rao presents to support his cat's paw theory is also persuasive as to pretext.  As discussed above, there is evidence that Dr. Friedman requested Abbott terminate Rao because of Giuliano's influence.  Dr. Friedman admitted that Giuliano contacted him while Giuliano was on suspension and told him that Rao was behind the complaints against Giuliano and that Giuliano gave Dr. Friedman the idea that he should escalate his complaints about Rao to Abbott upper management.  Giuliano tried to get Rao and others to lie for him during Abbott's investigation and, in exchange, Giuliano told Rao that he could "wash away this Friedman thing."  (Doc. 183, Fisher Decl., Ex. 38 at 1.)  But Rao and the others apparently declined to do so.

This is also not a case in which the decisionmakers that were purportedly responsible for the termination at issue were far removed from the underlying relationships and just accepted the facts as given by others. Otero was allegedly friends with Giuliano and supported him at the company. Otero had also been at least somewhat involved in the Giuliano-Dr. Friedman-Rao issues, and Hawks and Otero were involved in the investigation of Giuliano that had concluded just days before Dr. Friedman complained about Rao in November 2018. Further, Stafford and others testified that Otero had dismissed their allegations of harassment by Giuliano in February 2018 because Giuliano made a lot of money for Abbott. Hawks, Punzalan, and Otero also understood the usual methods by which sales representatives must try to court doctors, which gives rise to questions regarding whether they, as the purported ultimate decisionmakers, truly believed that Dr. Friedman's complaints about Rao were legitimate or if they believed they were a tool for Giuliano to terminate Rao in retaliation for his participation in the investigation—an investigation in which Giuliano had just been let off with a warning. Accordingly, there are triable questions of material fact on the issue of pretext and Rao's retaliation claims more broadly. The Court will, therefore, deny Abbott's summary judgment motion as to these claims.

c)      **Plaintiff's Age Discrimination Claims (Count 6: Age
        Discrimination in Violation of the Age Discrimination
        in Employment Act, 29 U.S.C. § 621, <u>et</u> <u>seq.</u>; Count 8:
        Age Discrimination in Violation of the Florida Civil
        Rights Act (Fla. Stat. § 760.01, <u>et</u> <u>seq.</u>))**

Rao also claims Abbott discriminated against him because of his age in

violation of the federal Age Discrimination in Employment Act ("ADEA") and

the Florida Civil Rights Act.  29 U.S.C. § 623(a)(1); Fla. Stat. § 760.10(1)(a).  Abbott

moves for summary judgment on these claims as well, arguing that Rao's age

discrimination claims fail because there is no evidence of age-based animus by

the Abbott managers who made the ultimate decision to terminate Rao.  The

Court is not persuaded by this argument for similar reasons as those underlying

its decision to deny summary judgment on Rao's retaliation claims.

Federal ADEA precedent applies to age discrimination claims under the

Florida Civil Rights Act.  <u>Reed v. Forney Indus., Inc.</u>, 800 F. App'x 782, 785 (11th

Cir. 2020); <u>Hollywood v. Hogan</u>, 986 So. 2d 634, 641 (Fla. Dist. Ct. App. 2008).  To

establish a prima facie case of age discrimination, Rao must show that he

> (1) was at least forty years old, (2) suffered an adverse employment
> action, (3) was meeting [his] employer's legitimate expectations at
> the time of the adverse employment action, and (4) was replaced by
> someone substantially younger.

51

Starkey v. Amber Enters, Inc., 987 F.3d 758, 763–64 (8th Cir. 2021) (citations

omitted).  "To establish a claim of intentional age discrimination, a plaintiff may

present direct evidence of such discrimination or may prove his claim through

circumstantial evidence."  Aulick v. Skybridge Americas, Inc., 860 F.3d 613, 620

(8th Cir. 2017) (quoting Carraher v. Target Corp., 503 F.3d 714, 716 (8th Cir.

2007)).  As with the retaliation claims analyzed above, if a plaintiff offers

circumstantial evidence of age discrimination as opposed to direct evidence, the

Court applies the McDonnell Douglas burden-shifting framework.  Id.  Whether

proving his case through direct or circumstantial evidence, however, Rao must

establish that his age was the "but-for" cause of his termination.  Gross v. FBL

Fin. Servs., Inc., 557 U.S. 167, 177 (2009).

Rao does not argue that he has direct evidence Abbott terminated him

based on his age.  Rather, Rao acknowledges that the McDonnell Douglas

analysis for claims based on circumstantial evidence applies to his age

discrimination claims.

### i)      Prima Facie Case

Abbott does not contest that Rao can satisfy the first three elements of a

prima facie case for age discrimination.  Rao was in a protected class under the

ADEA when he was terminated because he was 59, he was qualified for the position he had held for nearly twenty years, and he suffered at least one adverse employment action when he was suspended and then terminated.

Abbott, however, argues that Rao cannot satisfy the element of his prima facie case that requires him to show he was replaced by an employee who was "substantially younger." The employee Abbott hired to replace Rao was 54. Abbott argues that a five-year age gap is insufficient to establish an inference of age discrimination as a matter of law.

Rao responds that age-based animus can be inferred based on the combination of this age gap and other evidence, primarily Giuliano's age-based insults to Rao over the years. Rao notes that in other cases, depending on the circumstances, eight-year and six-year age differences have been found sufficient to support this element at the prima facie case stage. See Hilde v. City of Eveleth, 777 F.3d 998, 1008 (8th Cir. 2015). Under the circumstances of this case, the Court is not prepared to hold that a five-year age gap is insufficient to make out a prima face case as a matter of law. There is evidence of numerous age-based insults by Giuliano against Rao and others and evidence that Giuliano wanted to rebuild his sales team with new employees. Accordingly, the Court finds that

Rao has established a prima facie case for his age discrimination claims at this procedural stage of the proceedings.

### ii)   Legitimate, Non-Discriminatory Reason

As before, Abbott argues that Rao's violations of the prohibitions in the warnings regarding Dr. Friedman constitute legitimate, non-retaliatory reasons for his termination that have nothing to do with Rao's age. These reasons are sufficient to shift the burden back to Rao to show pretext.

### iii)   Pretext

Abbott argues Rao cannot show pretext for a variety of reasons. As before, Abbott argues that Giuliano was not the manager who was ultimately responsible for terminating Rao even if he insulted Rao based on his age on numerous occasions. Abbott asserts that Otero, Hawks, and Punzalan were responsible for Rao's termination and points out that Otero is also a member of Rao's protected class at age 46, which undermines any inference of age discrimination. See Askari v. L.A. Fitness Int'l., No. 09-cv-2789 (ADM/JSM), 2010 WL 3938320, at *5 (D. Minn. Oct. 5, 2010) (noting that "a plaintiff faces a difficult burden of establishing discrimination when the decision-maker is a member of the same protected class as the plaintiff.") (citations omitted). Abbott also points

out that it signed a new partnership agreement with Rao just 10 months before it

terminated him, which also undercuts any inference that it wanted to terminate

Rao based on his age.

Rao relies on the same cat's paw theory to show that Abbott's proffered

reasons for his termination were pretextual.  Rao argues Giuliano orchestrated

his termination and that Giuliano was motivated, at least in part, by age-based

animus against Rao in doing so.  In support, Rao points out that Giuliano

repeatedly levied age-based insults at him, including calling him and his fellow

sales representative Souder, "the old guys," "old fucks," "old farts," and

"crusty."  Giuliano also called younger employees the "up-and-coming guys"

and told Rao that he did not know how to work anymore, and even allegedly

threatened to "forcefully retire" Rao in one text message.  (Doc. 230, Fisher Decl.,

Ex. 25.)  Giuliano admits that he made jokes about Rao's age, including about

Rao's age impacting his ability to learn new technology.  (Doc. 197, Laudon Decl.,

Ex. 4 (Giuliano Dep.) at 263-64.)

This record is sufficient to create triable issues regarding the pretext

element of Rao's age discrimination claims.  While Abbott argues Giuliano's

insults were merely stray comments made well before Abbott terminated Rao,

the Court cannot make that determination on summary judgment. Similarly, Abbott's other arguments regarding Otero's age and Rao's partnership agreement may be presented to the jury but they do not warrant summary judgment on Rao's claims. Based on this record, a reasonable jury could infer that Rao's termination was motivated by age discrimination. The Court will, therefore, deny Abbott's Motion for Summary Judgment as to Rao's age-discrimination claims as well.

> **d)   Whistleblower Retaliation Under Florida Law Based on Ware Investigation (Count 3)**

Rao asserts that Abbott also violated the Florida Whistleblower Act ("FWA"), Fla. Stat. § 448.102, when it terminated his employment. Rao bases this claim on the same facts as his retaliation claim, discussed above, as well as his allegation that he provided Abbott with information during Abbott's October 2017 investigation into Ware's complaints about being forced to underreport his hours as a per diem worker.

The FWA provides:

An employer may not take any retaliatory personnel action against an employee because the employee has:

* * *

(2) Provided information to, or testified before, any
appropriate governmental agency, person, or entity
conducting an investigation, hearing, or inquiry into an
alleged violation of a law, rule, or regulation by the employer.

(3) Objected to, or refused to participate in, any activity,
policy, or practice of the employer which is in violation of a
law, rule, or regulation.

Fla. Stat. § 448.102.  The <u>McDonnell Douglas</u> burden-shifting framework and

Title VII analysis apply to FWA retaliation claims as well.  <u>Chaudhry v.</u>

<u>Adventist Health Sys. Sunbelt, Inc.</u>, 305 So. 3d 809, 814 (Fl. Dist. Ct. App. 2020).

Abbott argues that, to the extent Rao's whistleblower claim is based on the

same conduct as his retaliation claims, it fails for the same reasons.  Rao responds

that his whistleblower claim survives for the same reasons his other retaliation

claims survive and also because this claim is supported by Rao's involvement in

Abbott's investigation of Ware's reports of Giuliano underpaying his hours and

mileage.  To the extent Rao's whistleblower claim is based on the same reasoning

as his other retaliation claims, the Court denies summary judgment on this claim

for the reasons discussed above.  The Court, therefore, proceeds to analyze Rao's

whistleblower claim based on his involvement in the Ware investigation.

It appears Rao is arguing that he acted as a whistleblower in Abbott's

investigation of Ware's complaints because although he initially lied on

57

Giuliano's behalf in 2017, Rao claims he later refused to lie about Ware's complaints when he was interviewed by Curcio in October 2018—nine months after Ware resigned from Abbott.  When Ware first reported his concerns to Abbott human resources in October 2017, he noted that Rao was among the team members who had encouraged him to do so.  (Doc. 231, Fisher Decl., Ex. 32.)  But in October 2017, Rao quickly sent a text message to Otero that Giuliano had dictated, which supported Giuliano's version of events concerning Ware.  (Doc. 230, Fisher Decl., Ex. 31 at ll. 1404, 1408.)  Rao also supported Giuliano's narrative about Ware in his November 2017 interview with Abbott human resources. (Doc. 202, Curcio Decl., Ex. 43.)  Rao does not allege he told Abbott the truth about Ware's complaints prior to his October 2018 interview with human resources regarding its broader investigation into Giuliano.  (Doc. 230, Fisher Decl., Ex. 9 (Rao Dep.) at 326–27; Ex. 43.)

Abbott argues Rao cannot make out a prima facie case or show pretext to support a whistleblower claim based on his involvement in Ware's complaints. The Court agrees.  Abbott's records show that Rao initially stated that cutting back on Ware's hours "clearly makes sense" when Abbott questioned Rao about Ware in October 2017.  (Doc. 202, Curcio Decl., Ex. 43.)  The full year gap

between Ware's complaints and Rao's alleged decision to eventually support

Ware after he had already resigned undercuts any possibility that a reasonable

jury could find that Rao acted as a whistleblower concerning Ware.  See Green v.

Baptist Hosp., Inc., No. 3:15-cv-124, 2016 WL 7484892, at *4 (N.D. Fla. Nov. 28,

2016) (holding that gap of more than one year "between the reports and

plaintiff's termination does not suggest a causal connection" in whistleblower

case).  The notes from Rao's October 2018 interview also present few details as to

what Rao may have even told Abbott about Ware.  (See Doc. 202, Curcio Decl.,

Ex. 41.)

Even if Rao's whistleblower claim regarding Ware found support in the

record, Rao also fails to articulate how Abbott could have violated the law.  The

FWA requires Rao to prove that the "activity, policy or practice objected to is, in

fact, in violation of a law, rule or regulation, not merely that the employee

reasonably believed that the actions he objected to were in violation of a law,

rule, or regulation."  Gonzales v. GEO Grp., Inc., No. 17-cv-62186, 2018 WL

7144484, at *2, *2 n.1 (S.D. Fla. 2018) (citations omitted).  But as Abbott points out,

Ware was an independent contractor, presumably not covered by ordinary wage

and hour laws, meaning any failure to pay his wages was merely a breach of

contract.  See Bush v. Raytheon Co., No. 807-cv-02087-T-24 MAP, 2009 WL

10669904, at *5 (M.D. Fla. Sept. 8, 2009), aff'd, 373 F. App'x 936 (11th Cir. 2010)

(dismissing FWA claim in part because plaintiff plaintiff's allegations, even if

true, only showed a breach of contract by employer).

Rao responds that providing information about an "alleged" violation of

the law is protected under the FWA and Rao could have believed that failing to

pay Ware his appropriate wages was a violation of law whether Ware was an

independent contractor or an ordinary employee.  See Fla. Stat. § 448.102(2).  But

apart from his vague deposition testimony that he eventually refused to "back"

Giuliano regarding Ware's complaints, Rao does not provide any evidence that

he reported a violation of any law related to Ware to Abbott in either October

2017 or October 2018, whether the violation was "alleged" or not.  See Bush, 2009

WL 10669904, at *3 (noting that, even assuming breach of contract also

constituted a violation of the law, employee's evidence "do[es] not mention any

broken laws, rules, or regulations").

Based on the record before the Court, Rao cannot show that he engaged in

protected activity with regard to Ware's complaints or that his involvement in

the Ware investigation more generally was causally linked to Abbott's decision

to terminate him in December 2018.  The Court will, therefore, grant summary

judgment to Abbott to the extent Rao's FWA claim is premised on his

involvement in Abbott's investigation of Ware's complaints but deny summary

judgment on all other aspects of this claim.

> **e)**   **Plaintiff's Claim for Declaratory Relief (Count 4)**

Rao also seeks a declaratory judgment that his wrongful termination

makes the non-competition provisions in his Employment Agreement

unenforceable.  See Webb Pub. Co. v. Fosshage, 426 N.W.2d 445, 449 (Minn. Ct.

App. 1988) (holding that employer misconduct may render non-compete

unenforceable).  Because there are genuine issues of material fact regarding

whether Rao's termination was wrongful, the Court denies summary judgment

on this claim as well.

> **3.**   **Plaintiffs' Motion for Summary Judgment on Defendant St.
> Jude Medical S.C., Inc.'s Counterclaims**

St. Jude has counterclaimed against Rao for breach of the non-competition,

non-solicitation, and confidentiality provisions in his Employment Agreement.

(Doc. 139, Answer and Counterclaims ¶¶ 27, 29, 32.)  Rao now moves for

summary judgment on St. Jude's counterclaims for breach of the non-

competition and confidentiality provisions but does not move on the non-solicitation portion of the counterclaim.

At oral argument, Rao's counsel presented new authority that was not cited in Rao's earlier briefing: <u>Porous Media Corp. v. Midland Brake, Inc.</u>, 220 F.3d 954 (2000). In addition to the relief Rao previously requested, Rao argued that <u>Porous Media</u> supports the entry of summary judgment on St. Jude's claims for damages stemming from sales it allegedly lost after Rao's non-compete period ended, which lasted from December 14, 2018 to December 14, 2019 (the "Restricted Period"). The Court granted St. Jude leave to respond to this new authority and St. Jude filed its response on August 12, 2022. (Doc. 278.)

The non-compete provision of Rao's Employment Agreement provided:

> <u>Non-Competition</u>. During Employee's employment for a period of one (1) year after the date of termination of employment with SJMSC for any reason, Employee will not directly or indirectly sell, demonstrate, promote, solicit or support the sale of, support or supervise the implantation or other use of, or otherwise have any involvement with the sale or use of any product which competes with any products which Employee sold or solicited the sale of during his/her employment, to or with any customer upon whom Employee called during the last year of his/her employment. For a period of one (1) year after the date of termination of employment with SJMSC for any reason, Employee will not directly or indirectly influence or attempt to influence such customers to direct their business involving products sold by Employee to any competitor of SJMSC.

(Doc. 198, Hawks Decl., Ex. 34 ¶ 8.)  The Court previously determined that Rao's

non-compete is not unenforceable based on its scope more generally in the

course of resolving Abbott's motion to dismiss.  (Doc. 108.)

The confidentiality provision in Rao's Employment Agreement prohibits

Rao from disclosing Abbott's "Confidential Information" to a third party.  (Id. ¶

7(B).)  "Confidential Information" is defined as "any information used or useful

in [Abbott]'s business that is not generally known outside of [Abbott] and that is

proprietary to [Abbott] relating to any aspect of [Abbott's] existing or reasonably

foreseeable business which is disclosed to Employee . . . ."  (Id.)

Rao's Employment Agreement is governed by Minnesota law.  (Id. ¶

10(G)-(H).)  Under Minnesota law,

> The plaintiff carries the burden in a non-compete action to prove by
> a preponderance of the evidence that (a) profits were lost, (b) the
> loss was directly caused by the breach of the covenant not to
> compete, and (c) the amount of such causally related loss is capable
> of calculation with reasonable certainty rather than benevolent
> speculation.

Berg v. Miller, No. A04-1188, 2005 WL 832064, at *4 (Minn. Ct. App. Apr. 12,

2005) (citing B & Y Metal Painting, Inc. v. Ball, 279 N.W.2d 813, 816 (Minn. 1979)).

Whether or not a non-compete is involved, "[l]iability for breach of contract

requires proof that damages resulted from or were caused by the breach."

Border State Bank of Greenbush, 690 N.W.2d at 336.

### a)      Abbott's Non-Compete Counterclaim

Rao requests that St. Jude's non-compete counterclaim be dismissed or, in the alternative, limited to doctors for whom the Court finds St. Jude has presented admissible evidence of a potential breach and causally-related damages sustained from that breach within the Restricted Period.  In general, the non-compete provision only barred Rao from competitive activities related to competing products he sold or customers he solicited during his last year of employment with Abbott (the "Restricted Customers").  (Doc. 198, Hawks Decl., Ex. 34 ¶ 8.)

St. Jude does not dispute that Rao was allowed to communicate with Restricted Customers on a social basis or about products Rao had not sold for St. Jude, such as stents, during the Restricted Period.  St. Jude makes much of the fact that Rao began boasting about his ability to move business to competitors even before he was officially terminated by Abbott and that he continued to do so in conversations with competitors in the weeks and months following his termination.  But evidence that Rao called competitors and even boasted about

his ability to move business to them is not sufficient on its own to show that Rao is liable for breaching his non-compete. As noted above, St. Jude must also provide non-speculative evidence that Rao's actions <u>caused</u> St. Jude damages from lost sales. <u>See, e.g.</u>, <u>Berg</u>, 2005 WL 832064, at *4; <u>Border State Bank of Greenbush</u>, 690 N.W.2d at 336.

At the outset, St. Jude is only claiming damages from lost sales to 5 of the 20 doctors it identified during discovery as being individuals with whom it claims Rao violated his non-compete. (Doc. 218, Fisher Decl., Ex. 13 (Bahl Report) ¶ 48.) These 5 doctors are Drs. Pizzo, Peykar, Nandigam, Mathew, and Aldrich. (<u>Id.</u>) St. Jude argues that Rao should not be allowed to "pick off" individual doctors at summary judgment, but rather the jury should be allowed to consider the "entirety" of Rao's conduct in violation of the non-compete at trial, whether damages resulted from that conduct or not. St. Jude's argument, however, goes to the admissibility of individual pieces of evidence, which is an issue the Court will resolve at the time of trial. For present purposes, St. Jude has only alleged damages as to 5 doctors, which means the Court will grant summary judgment to Rao to the extent St. Jude's counterclaim relies on

allegations that Rao breached his non-compete by interacting with the other 15 doctors for whom St. Jude has not claimed any damages.

The extent to which St. Jude's counterclaim for breach of the non-compete can survive as it relates to the remaining five doctors depends on Rao's interactions with these doctors and the damages, if any, that St. Jude suffered as a result of those interactions.

### i)      Dr. Martin Aldrich

St. Jude claimed that it learned of Rao's violation of the non-compete with regard to Dr. Aldrich from Rao's former coworker, Souder.  However, Souder testified in his deposition that he had no knowledge of these allegations.  (Doc. 230, Fisher Decl., Ex. 12 (Souder Dep.) at 137.)  Further, St. Jude does not cite any calls, text messages, or meals involving Rao and Dr. Aldrich to support its claim. All that St. Jude points to as evidence is the fact that Dr. Aldrich increased his use of Biotronik devices following Rao's termination.  This change in sales is not sufficient on its own to demonstrate a breach of Rao's non-compete. Accordingly, the Court will grant summary judgment dismissing St. Jude's breach of contract counterclaim for damages based on allegedly lost sales to Dr. Aldrich.

### ii)      Dr. Dilip Mathew

As with Dr. Aldrich, St. Jude claimed it learned that Rao solicited business from Dr. Mathew in violation of his non-compete from Souder.  But Souder testified that he had no knowledge that Rao solicited business from Dr. Mathew. (Doc. 230, Fisher Decl., Ex. 12 (Souder Dep.) at 137.)  St. Jude also does not cite to any calls, text messages, or meals expensed to Biotronik involving Rao and Dr. Mathew to support its claim.  St. Jude again cites only to Dr. Mathew's increased purchase of Biotronik products following Rao's termination to support its claim. Because this change in sales volume is not sufficient to demonstrate breach on its own, the Court will grant summary judgment dismissing St. Jude's breach of contract counterclaim for damages based on lost sales to Dr. Mathew.

### iii)     Dr. Sydney Peykar

St. Jude also relies on increased Biotronik sales alongside decreased St. Jude sales to support its claim for breach of Rao's non-compete as to Dr. Peykar. St. Jude does not point to any evidence that Rao expensed meals with Dr. Peykar to Biotronik during the Restricted Period, that Rao called Dr. Peykar, or any other similar evidence.

But St. Jude also points to Rao's contacts with Dr. Popper, who referred patients to Dr. Peykar, as evidence that Rao breached the non-compete. Dr. Peykar did implant six Biotronik devices in patients referred by Dr. Popper during the Restricted Period. The record also demonstrates that Rao threatened to take Dr. Popper's business from Abbott before his termination and had meals with Dr. Popper during the Restricted Period at Biotronik's expense, although Rao claims he only discussed non-competing products like stents with Dr. Popper at these meals. There is also evidence that Rao visited Dr. Popper's office and distributed Biotronik promotional materials during the Restricted Period and added at least one entry to a shared Biotronik calendar for a CRM-related event for Dr. Popper.

However, St. Jude has failed to point to any evidence that Dr. Peykar decided to implant these six Biotronik devices in Dr. Popper's patients at Dr. Popper's request, as opposed to based on Dr. Peykar's own preferences. Further, the non-compete did not prevent Rao from contacting Dr. Popper during the Restrict Period. In fact, the non-compete allowed Rao to contact Restricted Customers to sell non-competing products and even allowed Rao to accept employment with an Abbott competitor, which he did when he started working

68

for Biotronik.  Given the narrow scope of Rao's non-compete, mere evidence that

Dr. Peykar implanted a Biotronik device in a patient after Rao spoke with a

doctor who referred patients to Dr. Peykar is simply too attenuated a connection.

A reasonable jury would be left to speculate as to whether Rao's contacts with

Dr. Popper were the cause of Dr. Peykar's decisions as to which brand of device

to use in a few of his patients.  The Court will, therefore, grant summary

judgment dismissing St. Jude's breach of contract counterclaim for damages

based on lost sales to Dr. Peykar as well.

### iv)    Dr. Bala Nandigam

The record concerning Rao's contacts with Dr. Nandigam during the

Restricted Period, however, is sufficient to create triable questions of material

fact concerning St. Jude's non-compete counterclaim.  Rao had phone

conversations with Dr. Nandigam or his office during the Restricted Period,

including two after he began working at Biotronik.  Souder also testified that he

saw Rao's handwriting on a patient chart at Dr. Nandigam's office during the

Restricted Period, indicating that Rao had performed a device check on a patient

with an Abbott device.  Rao also admitted that he met with Dr. Nandigam

during the Restricted Period to discuss Biotronik stents, but Rao's deposition

testimony revealed little familiarity with the stent products he allegedly discussed with Dr. Nandigam.  This evidence along with Dr. Nandigam's increased use of Biotronik CRM products coinciding with Rao's hiring at Biotronik is enough for the Court to deny Rao's summary judgment motion on this aspect of St. Jude's non-compete counterclaim related to Dr. Nandigam.

### v)    Dr. Anthony Pizzo

The evidence concerning Rao's contacts with Dr. Pizzo during the Restricted Period is similarly sufficient to create triable issues of material fact. Rao had meals with Dr. Pizzo during the Restricted Period that he expensed to Biotronik.  (Doc. 240, Laudon Decl., Ex. 20.)  Although Biotronik's records state that the purpose of these meals was to discuss non-competing products like stents, Rao's lack of familiarity with stents in his deposition raises questions as to the truth of this stated purpose.  Additionally, Rao added at least one entry to his Biotronik shared calendar for a CRM-related event for Dr. Pizzo.  Rao also told an Abbott coworker that, if here were terminated, he would take Dr. Pizzo's business with him.  Finally, Dr. Pizzo purchased his first Biotronik CRM product just four days after Rao signed his employment agreement to work at Biotronik.

Despite Dr. Pizzo's denial that Rao influenced his sales decisions during the Restricted Period, the Court will deny summary judgment and allow St. Jude's counterclaim for damages based on Dr. Pizzo to proceed to trial.

### b) Damages St. Jude Allegedly Sustained Outside the Restricted Period

Rao argues the Court should further restrict the damages St. Jude may recover on its non-compete counterclaim to those damages St. Jude alleges it sustained within the Restricted Period.  However, the precedent Rao relies on for this argument does not categorically preclude employers from recovering damages sustained after the expiration of a non-compete agreement.  Instead, the 8th Circuit in Porous Media reasoned that "post-agreement damages are consequential damages."  220 F.3d at 961 (citation omitted).  Under Minnesota law, "consequential damages flow naturally from the breach" and are recoverable if they were "reasonably foreseeable to the parties at the time of the breach."  Qwest Commc'ns Co., LLC v. Free Conferencing Corp., 905 F.3d 1068, 1076 (8th Cir. 2018) (quoting DeRosier v. Util. Sys. Of Am., Inc., 780 N.W.2d 1, 4-5 (Minn. Ct. App. 2010)).

The parties dispute whether Rao could have reasonably foreseen the post-contractual damages St. Jude alleges it sustained due to lost sales to Drs.

Nandigam and Pizzo.  Rao argues that he had no reason to think he could be held liable for damages arising after his non-compete expired because the non-compete allowed him to sell to Restricted Customers as soon as it expired.  St. Jude counters that nothing in the Employment Agreement limits its ability to seek consequential damages and that Rao should have reasonably foreseen causing damages to St. Jude outside of the Restricted Period based on his breaching activities within the Restricted Period.

The bar is higher for an employer to recover consequential damages sustained after the expiration of a non-compete agreement.  However, based on the record in this case, the Court cannot resolve this issue on summary judgment. The question of whether Rao could have reasonably foreseen causing the post-contractual damages St. Jude alleges involves disputed questions of material fact. The Court will, therefore, decline to enter summary judgment limiting St. Jude's damages to those it allegedly sustained within the Restricted Period.

### c)      Counterclaim for Breach of Confidentiality Provision

Finally, Rao moves for summary judgment dismissing St. Jude's counterclaim for breach of the confidentiality provision in his Employment Agreement.  "Confidential Information" is defined in the Employment

Agreement as "any information used or useful in SJMSC's business that is not generally known outside of SJMC and that is propriety to SJMC."  (Doc. 198, Hawks Decl., Ex. 34 ¶ 7(B).)  St. Jude argues Rao breached this provision by telling doctors about Abbott's investigations into Rao and Giuliano and by providing Biotronik with information on the preferences of the doctors with whom Rao had worked at Abbott.

St. Jude provides no legal authority demonstrating that telling doctors about the fact that Abbott was investigating Giuliano and Rao was confidential or proprietary.  The two cases St. Jude cites merely grant protective orders in cases concerning personnel information.  Butler v. DirectSAT USA, LLC, 876 F. Supp. 2d 560, 576 (D. Md. 2012); Smith v. Walley, No. 11-cv-79, 2011 WL 3108329, at *3 (E.D. Ark. July 26, 2011).  Additionally, discovery is closed and St. Jude has no specifics regarding what Rao supposedly told Dr. Pizzo or anyone else beyond that these investigations took place.  Dr. Pizzo also testified that he heard this information from multiple sources, which means this information was "generally known" outside of the company and, therefore, not confidential under the terms of the confidentiality provision.  Nor has St. Jude shown that Rao

caused any damages to St. Jude by telling outside doctors about these investigations.

With regard to physician preferences, the only evidence St. Jude presented in opposition to Rao's Motion for Partial Summary Judgment is that Roscoe provided information about these preferences to Biotronik, not that Rao provided Biotronik this information.

The Court will, therefore, grant summary judgment dismissing St. Jude's counterclaim for breach of the confidentiality provision in Rao's Employment Agreement.

### B.   Defendants' Motion for Sanctions

Under Federal Rule of Civil Procedure 37(e), Abbott moves for dismissal of Rao's claims as a sanction against Rao for intentional spoliation of electronically stored information ("ESI").  In the alternative, Abbott requests that the Court instruct the jury to presume that the information Rao allegedly destroyed would have been unfavorable to his case.  Abbott further requests an award of its attorneys' fees and costs incurred in bringing its motion for sanctions.  The Court will deny Abbott's Motion for Sanctions in its entirety for the reasons discussed below.

### 1.      Legal Standard – Rule 37

Federal Rule of Civil Procedure 37(e) provides:

If electronically stored information that should have been preserved in the anticipation or conduct of litigation is lost because a party failed to take reasonable steps to preserve it, and it cannot be restored or replaced through additional discovery, the court:

> (1) upon finding prejudice to another party from loss of the information, may order measures no greater than necessary to cure the prejudice; or
>
> (2) only upon finding that the party acted with the intent to deprive another party of the information's use in the litigation may:
>
>> (A) presume that the lost information was unfavorable to the party;
>>
>> (B) instruct the jury that it may or must presume the information was unfavorable to the party; or
>>
>> (C) dismiss the action or enter a default judgment.

The advisory committee notes to Rule 37 provide:

Subdivision (e)(2) does not include a requirement that the court find prejudice to the party deprived of the information. This is because the finding of intent required by the subdivision can support not only an inference that the lost information was unfavorable to the party that intentionally destroyed it, but also an inference that the opposing party was prejudiced by the loss of information that would have favored its position.

Fed. R. Civ. P. 37, 2015 advisory committee note, subdiv. (e)(2).

> Courts should exercise caution, however, in using the measures
> specified in (e)(2).  Finding an intent to deprive another party of the
> lost information's use in the litigation does not require a court to
> adopt any of the measures listed in subdivision (e)(2).  The remedy
> should fit the wrong, and the severe measures authorized by this
> subdivision should not be used when the information lost was
> relatively unimportant or lesser measures such as those specified in
> subdivision (e)(1) would be sufficient to redress the loss.

Id.

"A party is obligated to preserve evidence once the party knows or should know that the evidence is relevant to future or current litigation."  Paisley Park Enters., Inc. v. Boxill, 330 F.R.D. 226, 232 (D. Minn. 2019) (citations omitted). "The duty to preserve relevant evidence must be viewed from the perspective of the party with control of the evidence."  Id.  "The court should be sensitive to the party's sophistication with regard to litigation in evaluating preservation efforts; some litigants, particularly individual litigants, may be less familiar with preservation obligations than others who have considerable experience in litigation."  Fed. R. Civ. P. 37, 2015 advisory committee notes, subdiv. (e).

> Even when litigation is reasonably foreseeable, a party is under no
> obligation to keep every shred of paper, every e-mail or electronic
> document and every backup tape.  The duty to preserve evidence
> extends to those persons likely to have relevant information – the
> key players in the case, and applies to unique, relevant evidence that
> might be useful to the adversary.

76

Paisley Park Enters., Inc., 330 F.R.D. at 233 (cleaned up and citations omitted).

> Spoliation is the intentional destruction of evidence for the purpose
> of suppressing the truth that results in prejudice to the moving
> party.  Mere negligence, a finding that a party knew or should have
> known not to destroy relevant evidence, is not enough.

Fair Isaac Corp. v. Fed. Ins. Co., No. 16-CV-1054 (WMW/DTS), 2020 WL 9179259,

at *3 (D. Minn. May 15, 2020) (citing Stevenson v. Union Pacific Railroad Co., 354

F.3d 739, 745-46, 748, 751 (8th Cir. 2004)).

> In practice, an adverse inference instruction often ends litigation-it is
> too difficult a hurdle for the spoliator to overcome.  The in terrorem
> effect of an adverse inference is obvious.  When a jury is instructed
> that it may infer that the party who destroyed potentially relevant
> evidence did so out of a realization that the evidence was
> unfavorable, the party suffering this instruction will be hard-pressed
> to prevail on the merits.  Accordingly, the adverse inference
> instruction is an extreme sanction and should not be given lightly.

Zubulake v. UBS Warburg LLC, 220 F.R.D. 212, 219–20 (S.D.N.Y. 2003) (footnotes

omitted and cleaned up).  See also Auer v. City of Minot, 896 F.3d 854, 858 (8th

Cir. 2018) (noting that "deciding a case based on hypothesized evidence is strong

medicine").

### 2.  Allegedly Deleted Audio Recordings

While Rao was employed at Abbott, he recorded several conversations he

had with other Abbott employees, particularly Giuliano, on his company-issued

iPad.  (Doc. 197, Laudon Decl., Ex. 1 (Rao Dep.) at 71–73.)  On December 1, 2018,

the day after Rao was suspended, Rao forwarded the recordings and 27 other

emails to his personal email account.  (Doc. 169, Laudon Decl. ¶¶ 10-13; Doc. 170,

Laudon Decl., Exs. 8–16; Doc. 182, Bressman Decl. ¶ 3.)

On December 14, 2018, the day Abbott terminated Rao, Kami Hawks from

Abbott human resources emailed Rao a document that included an exit

instruction asking Rao "to return all property either on or immediately

following" his last day of work.  (Doc. 170, Laudon Decl., Ex. 20.)  The document

did not tell Rao not to reset any of his company-owned equipment before he

returned it.  (Id.)  Rao does not recall reading this email and testified that his

Abbott email account may have been terminated before he had the chance to

read it.  (Doc. 197, Laudon Decl., Ex. 1 (Rao Dep.) at 109.)

Rao returned his Abbott laptop but did not return the iPad immediately.

Rao testified that he did not return the iPad because he was not sure what to do

with the recordings and thought he should seek legal counsel as to what to do

with them.  (Id. at 109–10.)

At some point after Rao was terminated, he reset the iPad to its factory

settings.  (Id. at 105–06; Doc. 173, Kruse Decl. ¶¶ 6–10.)  Rao testified that he may

have reset the iPad because of the recordings, but he also assumed that

78

everything on the iPad was backed up on a cloud-based storage system.  (Doc.

197, Ex. 1 (Rao Dep.) at 106-07, 111.)

On January 29, 2019, Abbott requested, through Rao's former counsel, that

Rao return the iPad.  (Doc. 169, Laudon Decl., Ex. 24.)  Rao's counsel stated that

Rao would not return the iPad unless Abbott agreed to some protocol to preserve

any data that was associated with the device.  (See Doc. 169, Laudon Decl., Ex.

26.)  Abbott initially rejected this request from Rao's counsel and demanded that

Rao return the iPad immediately without conditions, threatening to "pursue all

legal means necessary to have our property returned."  (Doc. 169, Laudon Decl.,

Ex. 28.)  Abbott, however, eventually agreed to Rao's conditions, at least in part,

and on April 9, 2019, Rao's counsel submitted the iPad to a third party forensic

technology group.  (Doc. 173, Kruse Decl. ¶ 4.)

After some delay, Rao provided the iPad's password to the third party and

the third party determined that the iPad had been factory reset sometime around

January 30, 2019.  (Id. ¶¶ 6–10.)  During discovery, Rao produced the recordings

he had forwarded to his personal email account plus written transcripts of the

recordings.  (Doc. 183, Fisher Decl. ¶ 4.)  Rao testified that he did not know the

exact number of recordings on the iPad, but that he has provided all of them to Abbott.  (Doc. 197, Ex. 1 (Rao Dep.) at 71-72, 77–78.)

Rao's colleague, Souder, recalls Rao showing him the recordings before Rao was terminated.  (Doc. 197, Ex. 8 (Souder Dep.) at 92-93.)  Souder met Rao in Rao's driveway at night and Rao showed Souder that he had recordings on his iPad.  (Id. at 89–90, 93.)  Souder testified both that he recalled seeing "[m]aybe 30" recordings saved on the iPad and that he "can't even remember how many" recordings there were.  (Id. at 93, 169–70.)

While Rao admits he reset the iPad after being terminated, there is insufficient evidence that he did so with the intent of depriving Abbott of the use of the information stored on the device in this litigation.  There is also insufficient evidence that any relevant information was lost at all because Rao forwarded emails and recordings from the iPad to his personal email account and then produced them in discovery.  Rao and Souder both testified that they did not recall the exact number of recordings on the iPad, but Rao testified that Abbott has them all.  (Doc. 197, Ex. 1 (Rao Dep.) at 71-72.)  Souder's testimony is vague – he testified to seeing an iPad screen full of recordings in a brief encounter at night in Rao's driveway, but he did not know who made the recordings, only

heard one of them, and had no evidence that there were more than the files Rao has produced.

In addition, Rao reset the iPad months before this litigation commenced. This is a far cry from the cases Abbott relies upon, where a party destroyed potentially relevant evidence after litigation was already underway, where an opposing party had noted its intent to seek the information, or where a court had already issued an order regarding preservation.  See, e.g., Paisley Park Enter, Inc., 330 F.R.D. at 237-38; Leon v. IDX Systems Corp., 464 F.3d 951, 959 (9th Cir. 2006); Barsoum v. NYC Hous. Auth., 202 F.R.D. 396, 400 (S.D.N.Y. 2001). Moreover, Rao is an individual with no litigation experience, as opposed to a sophisticated business defendant with a document retention policy.  See Fed. R. Civ. P. 37, 2015 advisory committee notes, subdiv. (e).  Rao also testified that he assumed everything saved on his iPad was "backed up to the Cloud" when he reset the device.  (Doc. 197, Ex. 1 (Rao Dep.) at 111.)  These facts weigh against a finding that Rao was anticipating the present litigation when he reset the iPad.

Further, the fact that Rao supported his colleagues in their complaints against Giuliano and suggested that they meet with a lawyer and document their complaints, does not show that Rao knew in the fall of 2018 when he was

engaged in these activities that <u>he</u> was going to sue Abbott over his own eventual

termination.  Even Rao's demand in January 2019 that Abbott pay him his wages

due does not show that he anticipated filing a wrongful termination lawsuit

against Abbott on that date.  Presumably, many individuals who are terminated

from their jobs request their last paycheck without contemplating that such a

request will result in litigation.

However, even if Rao did anticipate litigation when he reset the iPad, there

is little evidence that he reset the device with the intent to deprive Abbott of

those recordings in this litigation.  Logically, any recordings Rao made would

likely show Giuliano in a bad light and, therefore, their contents would not be

favorable to Abbott's defense of Rao's claims.

Finally, while it is true that Rao destroyed evidence insofar as the

metadata for the recordings was lost when he forwarded them to his email, there

is also insufficient evidence that Rao deleted this metadata intentionally or that it

contained any relevant information whatsoever.  <u>See</u> <u>Paisley Park Enters., Inc.</u>,

330 F.R.D. at 233 ("a party is under no obligation to keep every shred of paper,

every e-mail or electronic document and every backup tape . . . [t]he duty to

preserve evidence . . . applies to unique, relevant evidence that might be useful to the adversary").

Therefore, there is insufficient evidence of Rao's intent or prejudice to Abbott to warrant sanctions under either Rule 37(e)(1) or 37(e)(2) based on the hypothetical loss of additional recordings from Rao's iPad.

### 3.    Allegedly Deleted Text Messages

Abbott also brings its sanctions motion based on Rao's alleged deletion of relevant text messages with Dr. Pizzo.  Abbott has even less evidence that Rao deleted any relevant text messages he may have exchanged with Dr. Pizzo.

During discovery, Rao did not produce any text messages between himself and Dr. Pizzo.  (Doc. 172, Ellison Decl. ¶ 4.)  Rao's counsel stated that Rao was not withholding any text messages between Rao and Dr. Pizzo for the period designated for document production, January 1, 2017 and December 14, 2019. (Id. ¶ 7, Ex. 3; Doc. 182, Bressman Decl. ¶ 5.)  Abbott argues that it cannot be true that no such messages ever existed because Rao and Dr. Pizzo were close friends and spoke to each other frequently.  Abbott also argues that if text messages between Rao and Dr. Pizzo did exist, they would likely be relevant because after Abbott fired Rao, Dr. Pizzo shifted his business from Abbott to Biotronik.  (Doc. 230, Fisher Decl., Ex. 8 (Pizzo Dep.) at 34-37.)

Abbott also served Dr. Pizzo with a subpoena during discovery.  (Doc. 184, Fisher Decl., Ex. 44.)  Dr. Pizzo did not produce any text messages in response to the subpoena either.  (Id.)  Dr. Pizzo and Rao did, however, produce emails between themselves.  (Doc. 230, Ex. 8 (Pizzo Dep.) at 102-05; Doc. 197, Laudon Decl., Ex. 1 (Rao Dep.) at 154.)

Rao explains that he ordinarily communicates with Dr. Pizzo by telephone call as opposed to text message.  The data from Rao's cell phone corroborates this assertion; between November 1, 2018 and December 14, 2019, Rao and Pizzo engaged in 186 telephone calls.  (Doc. 182, Bressman Decl. ¶ 4.)  During his deposition, when asked if he texted with Rao, Dr. Pizzo testified: "More typically, if I want to discuss something with him I would be more inclined to call him on the drive home or something."  (Doc. 230, Fisher Decl., Ex. 8 (Pizzo Dep.) at 48.)  Dr. Pizzo also did not testify that he was withholding any relevant text messages with Rao.  (Id. at 162–64.)

Abbott bears the burden on its motion for sanctions and, as with the allegedly lost iPad recordings, Abbott has failed to satisfy this burden for its allegation that Rao deleted relevant text messages involving Dr. Pizzo.  See Flanders v. Dzugan, No. CIV. A. 12-1481, 2015 WL 5022734, at *5 (W.D. Pa. Aug.

84

24, 2015) ("A proper spoliation claim requires the moving party to set forth evidence with specificity.  In the absence of a showing that specific evidence was destroyed in order to prevent it from being used by the adverse party, a spoliation instruction is improper.") (citations omitted).  Abbott points to no witness who testified that Dr. Pizzo and Rao sent text messages to each other at all.  Despite forensic examinations of Rao's cell phone, there is no evidence of such texts.  Dr. Pizzo and Rao's deposition testimony is consistent with phone records that they communicated extensively through calls as opposed to text messages.  Moreover, even if there was non-speculative evidence of lost text messages, there is no indication that such messages should have been preserved for litigation, i.e., that they were related to this case as opposed to purely personal communications.  See Paisley Park Enters., Inc., 330 F.R.D. at 233 (noting that the duty to preserve only extends to relevant evidence and parties are "under no obligation to keep every shred of paper").  Accordingly, the Court will deny Abbott's motion for sanctions and corresponding request for an award of costs and attorney's fees.

C.      **Defendants' Motion to Exclude the Testimony of David D. Jones, Ph.D.**

At oral argument, Abbott's counsel withdrew the portions of its Motion to Exclude Dr. Jones based on its arguments that Dr. Jones is not qualified and that his opinions are not reliable under Federal Rule of Evidence 702.  (Doc. 280, Hearing Tr. at 47.)  Instead, Abbott now only moves for sanctions under Federal Rules of Civil Procedure 16, 26, and 37 for Rao's alleged violations of the rules governing expert disclosures.  Abbott requests a variety of sanctions including that the Court exclude Dr. Jones's third and fourth expert reports or, in the alternative, grant Abbott leave to depose Dr. Jones again, allow Abbott to submit a new rebuttal report, and order Rao to reimburse Abbott for its costs and attorney's fees incurred in, among other things, bringing the present motion, taking a second deposition of Dr. Jones, and issuing a new rebuttal report.  (Doc. 208 at 32; Doc. 250 at 6.)  As with Abbott's other motion for sanctions, the Court will deny Abbott's requests for sanctions and its Motion to Exclude Dr. Jones in their entirety.

### 1.      Legal Standards – Rules 16, 26, and 37

Federal Rule of Civil Procedure 16(f) provides:

(1) In General. On motion or on its own, the court may issue any just orders, including those authorized by Rule 37(b)(2)(A)(ii)-(vii), if a party or its attorney:

* * *

(C) fails to obey a scheduling or other pretrial order.

(2) Imposing Fees and Costs. Instead of or in addition to any other sanction, the court must order the party, its attorney, or both to pay the reasonable expenses – including attorney's fees – incurred because of any noncompliance with this rule, unless the noncompliance was substantially justified or other circumstances make an award of expenses unjust.

Federal Rule of Civil Procedure 37 provides the Court with

discretion to award sanctions for failures to produce discovery as required:

If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless.  In addition to or instead of this sanction, the court, on motion and after giving an opportunity to be heard:

(A) may order payment of the reasonable expenses, including attorney's fees, caused by the failure;

(B) may inform the jury of the party's failure; and

(C) may impose other appropriate sanctions, including any of the orders listed in Rule 37(b)(2)(A)(i)-(vi).

Fed. R. Civ. P. 37(c)(1).

Federal Rule of Civil Procedure 26(e), however, requires parties to

"supplement" their discovery disclosures, including expert reports, under

certain circumstances.  The Rule provides:

> (1) In General. A party who has made a disclosure under Rule 26(a)
> – or who has responded to an interrogatory, request for production,
> or request for admission – must supplement or correct its disclosure
> or response:
>
>> (A) in a timely manner if the party learns that in some
>> material respect the disclosure or response is incomplete or
>> incorrect, and if the additional or corrective information has
>> not otherwise been made known to the other parties during
>> the discovery process or in writing; or
>>
>> (B) as ordered by the court.
>
> (2) Expert Witness. For an expert whose report must be disclosed
> under Rule 26(a)(2)(B), the party's duty to supplement extends both
> to information included in the report and to information given
> during the expert's deposition. Any additions or changes to this
> information must be disclosed by the time the party's pretrial
> disclosures under Rule 26(a)(3) are due.

Fed. R. Civ. P. 26(e).

### 2.     Dr. Jones's Expert Reports

Under the Court's pretrial scheduling order, the parties were required to

serve initial written expert reports on or before April 2, 2021.  (Doc. 179 at 3.)

Rebuttal expert reports were due on or before April 30, 2021.  (Id.)  All expert

discovery, including expert depositions, was required to be completed by May

21, 2021.  (Id.)  In his report and the supplements thereto, Dr. Jones purports to

quantify Rao's economic losses due to his termination from Abbott.  As Dr. Jones

explained, "[t]he calculation of losses is simple: salary and commissions that

could have been expected from Abbott Labs, plus any lost fringe benefits, less

any compensation from post-termination employment."  (Doc. 209, Ellison Decl.,

Ex. 3 at 1.)

On April 2, 2021, Rao produced Dr. Jones's initial expert report.  (Doc. 225,

Bressman Decl. ¶ 2; Ex. 3.)  In the report, Dr. Jones calculated four categories of

damages: (1) compensation losses, (2) investment-related losses due to the early

liquidation of Rao's investments in Abbott's Management Savings Plan ("MSP");

(3) MSP tax-related damages; and (4) tax neutralization damages.  (Id., Ex. 3.)

On May 14, 2021, following the close of fact discovery, Abbott produced a

document dated December 6, 2017, which showed Rao had elected that his MSP

distributions be taken in a lump sum, as opposed to over a period of time as Dr.

Jones had calculated in his initial report.  (Doc. 225, Bressman Decl., Ex. 6.)  Rao's

counsel promptly told Abbott's counsel that Dr. Jones intended to revise his first

report based on this new information.  (Id.)  The parties agreed to reschedule Dr.

Jones's deposition to allow Abbott the ability to review his supplemental report. (Id.)

On May 16, 2021, Rao produced a two page supplement to Dr. Jones's initial report. (Doc. 225, Bressman Decl. ¶ 3; Doc. 209, Ellison Decl., Ex. 4.) In the supplemental report, Dr. Jones adjusted two damages categories, the MSP tax-related damages and the tax neutralization damages. (Doc. 209, Ellison Decl., Ex. 4.) The other two damages categories remained the same. (Id.)

On May 26, 2021, Abbott's counsel deposed Jones from 9:00 a.m. to 5:00 p.m. (Doc. 225, Bressman Decl. ¶ 4.) Two days later, on May 28, 2021, Rao's counsel informed Abbott that Rao would concede that Rao's MSP funds had to be disbursed in a lump sum rather than over a 15-year period. (Doc. 228, Fisher Decl. ¶ 2.) Rao's counsel further stated that Jones would issue another supplemental report that reflected this correction and combined the first and second reports into one "omnibus report." (Id.)

On June 8, 2021, Rao produced Dr. Jones's third supplemental "omnibus" expert report. (Doc. 225, Bressman Decl. ¶ 5; Doc. 209, Ellison Decl., Ex. 5.) In his third report, Dr. Jones withdrew the two categories of damages he had adjusted in his earlier supplement, the MSP tax-related damages and the tax

neutralization damages.  (Id.)  According to Rao's counsel, Dr. Jones withdrew

the MSP-tax related damages because they turned out to be "nominal."  (Doc. 224

at 17.)  Rao's counsel also explained that Dr. Jones removed the tax neutralization

category because Rao had withdrawn his request for this category of damages in

response to Abbott's arguments.  (Id. at 21.)  Dr. Jones also made minor

adjustments to the two remaining damages categories to correct an error in the

percentage he had used to calculate losses on Rao's 401(k) investments (4.0% vs.

3.75%) and to update the MSP liquidation damages to reflect market changes.

(Id.)  These changes resulted in a total damages figure of $1,097,494.  (Id.)

On August 4, 2022, Rao filed a declaration with the Court attaching

another short supplement to Dr. Jones's report, which was dated August 2, 2022.

(Doc. 273, Fisher Decl., Ex. 9.)  The body of this latest supplement is one page

long.  (Id.)  Counsel explained that this fourth supplemental report was being

produced pursuant to Federal Rules of Civil Procedure 26(a)(2)(E) and 26(e)(2).

(Id. ¶ 2.)  Counsel further explained,

> The August 2, 2022, supplement was provided because of Plaintiff's
> decision to cut off damages he is seeking for losses of salary,
> commissions, 401(k) contributions, and COBRA expenses, as of July
> 8, 2020 (the end of his first contract year at Biotronik).  The August 2,
> 2022 supplement also brings up to date losses Plaintiff is seeking

related to MSP investment value, which resulted in a decrease in
that category of damages.

(Id. ¶ 3.)  By way of further explanation, at oral argument Rao's counsel stated

that Rao decided to cut off his damages claim at July 8, 2020 because Rao

mitigated his damages based on what he had earned at Biotronik following July

8, 2020, and also in order to simplify Rao's damages claim for presentation at

trial.  (Doc. 280 at 52-53.)  Due to these changes, Rao's alleged economic damages

fell to $542,465.  (Doc. 273, Fisher Decl., Ex. 9.)

On August 5, 2022, Abbott filed a letter with the Court requesting that the

August 9, 2022 hearing on Abbott Motion to Exclude Dr. Jones be postponed.

(Doc. 274.)  Rao opposed Abbott's request.  (Doc. 275.)  The Court denied

Abbott's request to delay the hearing.  (Doc. 276.)

### 3.    Timeliness of the Expert Reports

Abbott argues that Dr. Jones's third and fourth supplemental reports are

untimely and asks the Court to sanction Rao accordingly.  In support, Abbott

argues these new reports are not appropriate supplements under Rule 26(e), but

rather, entirely new expert reports containing new "methodologies," which Rao

issued in violation of the Court's pretrial scheduling order.  The Court's review

of the disputed reports, however, proves otherwise.  Dr. Jones's third and fourth

reports were proper supplements under Rule 26(e) and even if they were not,

sanctions would be inappropriate because these disclosures were harmless to

Abbott.

The reports at issue are not complex compared to many expert

submissions this Court receives; each report is only a few pages long.  (See Doc.

209, Ellison Decl., Exs. 3-5; Doc. 273, Fisher Decl., Ex. 9.)  The bodies of Dr.

Jones's third and fourth reports are four pages and one page long, respectively.

(Doc. 209, Ellison Decl., Ex. 5; Doc. 273, Fisher Decl., Ex. 9.)  Further, the changes

Dr. Jones made between his second, third, and fourth reports are not only minor,

they also benefit Abbott by significantly reducing the overall damages Rao is

seeking.  In his third report, Dr. Jones withdrew two categories of damages and

in his fourth report, he simply updated the remaining categories.  Dr. Jones now

calculates two categories of alleged damages: (1) compensation losses; and (2)

losses due to the early liquidation of Rao's MSP retirement account.

Abbott contends Dr. Jones's third and fourth reports are untimely because

they do not qualify as supplements under Rule 26(e) and, therefore, violate the

deadlines for expert disclosures found in the Court's pretrial scheduling order.

Under Rule 26(e)(1)(A), a party "must" issue a supplemental expert report "if the

party learns that in some material respect the disclosure . . . is incomplete or incorrect." Rule 26(e)(2) further requires that any supplements to an expert's report be made "by the time the party's pretrial disclosures under Rule 26(a)(3) are due." A party's pretrial disclosures are due 30 days before trial unless the Court orders otherwise. Fed. R. Civ. P. 26(a)(3)(B).

In support of their argument that Dr. Jones's third and fourth reports are not proper supplements to his original report under these Rules, Abbott cites, among other cases, Petrone v. Werner Enters., Inc., 940 F.3d 425 (8th Cir. 2019) and S&H Farm Supply, Inc. v. Bad Boy, Inc., No. 18-03413-CV-S-BP, 2020 WL 8372645 (W.D. Mo. Sept. 10, 2020). In Petrone, the Eight Circuit determined that an expert report was not a proper supplement because the report did not merely correct "inaccuracies" or fill "the interstices of an incomplete report based on information that was not available at the time of the initial disclosure." 940 F.3d at 432-33. Rather, the plaintiffs in Petrone issued the new report after the defendants uncovered "considerable flaws in the methodology" the plaintiffs' expert had used in his original report. Id. at 432. To allow the untimely report, the court had to reopen discovery, deny pending dispositive motions without prejudice, and delay trial. Id. at 433. The court found that the report at issue was

94

not a proper supplement and that the remedial actions it was forced to take

meant that the untimely report was neither "substantially justified" nor

"harmless" to the defendants under Federal Rule of Civil Procedure 37.  Id.

Next, in S&H Farm Supply, the court rejected the plaintiff's attempt to

submit a new declaration from its expert in response to the defendant's summary

judgment motion.  2020 WL 8372645, at *1.  The plaintiff admitted there was

nothing new from its expert in the declaration.  Id. at *2.  Instead, the court found

that the plaintiff had offered the declaration as "an elaboration or restatement of

[the expert's] prior opinions and not a supplement intended to correct anything

[the expert] said previously."  Id.

As the courts in Petrone and S&H Farm Supply recognized, Rule 26(e)

allows a party to submit a supplemental expert report to correct minor errors or

when an expert becomes aware of new information that was unavailable at the

time of the expert's initial report.  940 F.3d 422-23.  Here, Dr. Jones's third and

fourth reports did both.  In his third report Dr. Jones corrected a .25% error in the

rate he used to calculate damages Rao's 401(k) damages and he simply updated

other investment-related losses to reflect market changes since his previous

report.  He updated these investment-related losses in the same manner in his

fourth report.

The only significant changes Dr. Jones made to his damages calculations in

his third and fourth supplements were to withdraw two categories of damages

and to cut off another category as of July 8, 2020.  Abbott argues that Dr. Jones

was precluded from making such changes because Rao has not shown that any

new information necessitated them, but Abbott cites no authority precluding a

party from voluntarily withdrawing a category of damages during litigation.

Nor does Abbott cite any authority precluding a party from then providing the

other side with notice of such a decision via a supplemental expert report.  Rao

also notes that Abbott did produce new information after Dr. Jones issued his

initial report by untimely producing a document evidencing Rao's past elections

for his MSP funds.  Accordingly, unlike the reports at issue in Petrone and S&H

Farm Supply, Dr. Jones appropriately issued supplemental reports to fix minor

errors and to reflect Rao's decision to no longer pursue a few categories of

damages.

Even if Dr. Jones's third and fourth reports were not proper supplements,

Abbott would still not be entitled to the variety of sanctions it seeks because it

has failed to articulate any legitimate prejudice it has suffered as a result of these new reports. Rules 16(f) and 37(c)(1) both provide that Courts should not award sanctions for an untimely disclosure where the conduct at issue was "substantially justified or is harmless," or where "other circumstances make an award of expenses unjust." Fed. R. Civ. P. 16(f); 37(c)(1). Further, the Court has "wide discretion" in fashioning appropriate sanctions under these Rules. Wegener v. Johnson, 527 F.3d 687, 692 (8th Cir. 2008). In determining whether sanctions are appropriate, courts consider "the reason for noncompliance, the surprise and prejudice to the opposing party, the extent to which allowing the information or testimony would disrupt the order and efficiency of the trial, and the importance of the information or testimony." Id. at 692.

The circumstances surrounding Dr. Jones's third and fourth reports do not warrant sanctions. As described above, the decisions to issue supplemental reports were based on legitimate reasons, including the need to fix minor errors, update a calculation based on market changes, and to provide Abbott with notice that Rao was no longer seeking certain categories of damages. Further, unlike in Petrone, Abbott has not articulated any meaningful prejudice from Dr. Jones's third and fourth reports. 940 F.3d at 433. It bears repeating that these

supplements significantly <u>reduced</u> the amount of damages Rao is seeking from Abbott.

The changes in Dr. Jones's third and fourth reports are also relatively simple. While Abbott repeatedly claims that Dr. Jones has changed his "methodology," Abbott fails to explain what changed about Dr. Jones's methodology. Further, the third and fourth reports were issued well in advance of trial. And, Dr. Jones's testimony is important to allow Rao to present a sound damages calculation at trial. Accordingly, based on the Court's analysis of these factors, sanctioning Rao in the manner Abbott seeks is not appropriate under either of Federal Rules of Civil Procedure 16(f) or 37(c)(1).

Of course, Abbott is not without recourse if it believes it needs to further investigate Dr. Jones's third and fourth reports to adequately prepare to cross examine him at trial. Abbott's expert may submit his own supplemental rebuttal report. If Abbott believes it needs to depose Dr. Jones again, it may file a nondispositive motion before the presiding Magistrate Judge to reopen expert discovery for this limited purpose. However, such a motion is not properly before this Court at this time.

Based on the foregoing reasons, the Court will deny Abbott's Motion to Exclude Dr. Jones and corresponding requests for sanctions.

### D.    Plaintiff's Motion to Bifurcate Trial

Finally, Rao has moved to bifurcate the trial, requesting the Court hold separate trials on Rao's claims and St. Jude's counterclaim.  (Doc. 191.)  Because there is significant overlap between these claims and the evidence the parties will likely present to support them, the Court will deny Rao's Motion to Bifurcate. See, e.g., In re RFC & ResCap Liquidating Tr. Litig., No. 16-cv-3024 (SRN/HB), 2019 WL 2337323, at *3-4 (D. Minn. June 9, 2013) (denying motion to bifurcate trial because claims were "intertwined").

### ORDER

Based  upon  the  files,  records,  and  proceedings  herein, **IT  IS  HEREBY ORDERED**:

1.    Defendants' Motion for Summary Judgment (Doc. 194) is **GRANTED IN PART AND DENIED IN PART** as follows:

    a.  Summary judgment is **DENIED** as to Plaintiff's breach of contract claim (Count 1) for improper termination but **GRANTED** as to Plaintiff's breach of contract claim for unpaid commission from the period when he was still employed by Defendants;

    b.  Summary judgment is **DENIED** as to Plaintiff's retaliation claims (Counts  7, 9);

99

CASE 0:19-cv-00923-MJD-BRT  Doc. 282  Filed 09/27/22  Page 100 of 100

    c. Summary judgment is **DENIED** as to Plaintiff's age-discrimination claims (Counts 6, 8);

    d. Summary judgment is **GRANTED** as to Plaintiff's claim under the Florida Whistleblower Act to the extent this claim relies on Plaintiff's involvement in the Ware investigation but **DENIED** as to all other aspects of this claim (Count 3);

    e. Summary judgment is **DENIED** as to Plaintiff's claim for declaratory relief (Count 4).

2.    Plaintiffs' Motion for Summary Judgment (Doc. 214) is **GRANTED IN PART AND DENIED IN PART** as follows:

    a. Defendant St. Jude Medical S.C., Inc.'s counterclaim for breach of contract is **DISMISSED** to the extent St. Jude seeks damages based on lost sales to any doctors except for Drs. Nandigam and Pizzo; St. Jude may seeks its alleged damages based on lost sales to Dr. Nandigam and Dr. Pizzo at trial;

    b. Defendant St. Jude Medical S.C., Inc.'s counterclaim for breach of the confidentiality provision in Plaintiff's Employment Agreement is **DISMISSED**.

3.    Defendants' Motion for Sanctions (Doc. 166) is **DENIED**;

4.    Defendants' Motion to Exclude the Testimony of David D. Jones, Ph.D. (Doc. 205) is **DENIED**;

5.    Plaintiff's Motion to Bifurcate Trial (Doc. 189) is **DENIED**.

DATED:  September 27, 2022        s/Michael J. Davis
                                    Michael J. Davis
                                    United States District Court